# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

## Appeal No. 22-1027

---

MARIO CRUZADO,

Petitioner-Appellant,

v.

NELSON ALVES, Superintendent of MCI Norfolk,

Respondent-Appellee.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

Case No. 1:18-cv-12361-DJC
The Honorable Denise J. Casper

---

## CORRECTED BRIEF OF PETITIONER-APPELLANT MARIO CRUZADO

---

Emma Quinn-Judge (1st Cir. #1138229)
Thomas Miller (1st Cir. #1207777)
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA 02110
(617) 742-6020
equinn-judge@zalkindlaw.com
tmiller@zalkindlaw.com

May 22, 2023

# Table of Contents

Jurisdictional Statement............................................................................1

Statement of the Issue ............................................................................2

Statement of the Case ............................................................................2

Summary of Argument..........................................................................14

Argument................................................................................................18

    I. Jurisdiction................................................................................18

        A. The District Court's initial order denying a writ of habeas corpus and providing thirty days to address appealability was not a "final order" in the context of a habeas proceeding because it did not comply with habeas rules or this Court's local rules ..............19

        B. In the alternative, the motion for extension of time to brief appealability, filed within thirty days of the District Court's order denying a writ of habeas corpus, was the functional equivalent of a notice of appeal..........................................................................21

    II. The Writ of Habeas Corpus Should Issue.....................................27

        A. Standard of review...................................................................28

        B. Cruzado has exhausted his state court remedies.....................30

        C. Admitting the unredacted recording in which Cruzado repeatedly used a racial epithet violated due process and rendered Cruzado's trial fundamentally unfair...........................................30

            1. Serious evidentiary errors can warrant habeas relief. ..........31

            2.The Supreme Judicial Court's decision was an unreasonable application of due process principles. .......................................33

            3.The recording was unfairly prejudicial to Cruzado. ...............34

            4. The unfairly prejudicial portion of the recording had minimal probative value. .........................................................................38

D. Admitting the recording had a substantial and injurious effect or influence in determining on the jury's verdict ..........................43

Conclusion ...............................................................................46

Certificate of Compliance..........................................................47

# Table of Authorities

## Cases

*Anderson v. District of Columbia*, 72 F.3d 166 (D.C. Cir. 1995) ............ 25

*Barbosa v. Mitchell*, 812 F.3d 62 (1st Cir. 2016) .................................... 28

*Bowles v. Russell*, 551 U.S. 205 (2007) ................................................... 22

*Campiti v. Matesanz*, 333 F.3d 317 (1st Cir. 2003) ........................... 23, 24

*Clark v. Cartledge*, 829 F.3d 303 (4th Cir. 2016).................................... 24

*Commonwealth v. Bishop*, 461 Mass. 586, 963 N.E.2d 88 (2012) .......... 39

*Commonwealth v. Cruzado*, 480 Mass. 275, 103 N.E.3d 732 (2018)
............................................................................................................. passim

*Coningford v. Rhode Island*, 640 F.3d 478 (1st Cir. 2011) ......... 31, 32, 42

*Evans v. Thompson*, 518 F.3d 1 (1st Cir. 2008)...................................... 29

*Fortini v. Murphy*, 257 F.3d 39 (1st Cir. 2001)...................................... 30

*Foxworth v. St. Amand*, 570 F.3d 414 (1st Cir. 2009) .......... 28, 43, 45, 46

*Gomes v. Silva*, 958 F.3d 12 (1st Cir. 2020)............................................ 31

*Hawkins v. United States*, 358 U.S. 74, 80 (1958).................................. 46

*Huddleston v. United States*, 485 U.S. 681 (1988) ................................. 33

*Lyons v. Brady*, 666 F.3d 51 (2012).......................................................... 31

*McKinney v. Rees*, 993 F.2d 1378 (9th Cir. 1993) .................................. 32

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) .............................................. 29

*Miranda v. Arizona,* 384 U.S. 436 (1966) ............................................... 34

*Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022 (9th Cir. 1998) .................................................................................34

*O'Brien v. Town of Bellingham*, 943 F.3d 514 (1st Cir. 2019)...............25

*O'Neal v. McAninch*, 513 U.S. 432 (1995) ...............................................28

*Ortberg v. Moody*, 961 F.2d 135 (9th Cir. 1992) .....................................26

*Payne v. Tennessee*, 501 U.S. 808 (1991)..................................................31

*Rivera v. Thompson*, 879 F.3d 7 (1st Cir. 2018) ...............................29, 34

*Smith v. Barry*, 502 U.S. 244 (1992) ........................................................22

*Thomas v. Morton Int'l, Inc.*, 916 F.2d 39 (1st Cir. 1990) (per curiam) .23

*Torres v. Oakland Scavenger Co.*, 487 U. S. 312 (1988))........................22

*United States v. Gamory*, 635 F.3d 480 (11th Cir. 2011) .......................34

*United States v. Gonyer*, 761 F.3d 157 (1st Cir. 2014) ...........................38

*United States v. Gooch*, 842 F.3d 1274 (2016) ...................................24, 25

*United States v. Hardy*, 37 F.3d 753 (1st Cir. 1994) ..............................43

*United States v. Lawrence*, 889 F.2d 1187 (1st Cir. 1989) .....................34

*United States v. Pena*, 24 F.4th 46 (1st Cir. 2022) .................................38

*United States v. Price*, 13 F.3d 711 (3d Cir. 1994)..................................42

*United States v. Rodriguez-Rosado*, 854 F.3d 122 (1st Cir. 2017) .........26

*United States v. Saccoccia*, 58 F.3d 754 (1st Cir. 1995) .........................35

*United States v. Smith*, 292 F.3d 90 (1st Cir. 2002)................................37

*United States v. Wells*, 879 F.3d 900 (9th Cir. 2018)...............................33

iv

*Wells v. Ryker*, 591 F.3d 562 (7th Cir. 2010) ........................................... 23

*White v. Coplan*, 399 F.3d 18 (1st Cir. 2005)) ........................................ 29

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................ 29

**Statutes**

28 U.S.C. § 2241 ....................................................................................... 1

28 U.S.C. § 2253 ...................................................................... 1, 13, 19, 21

28 U.S.C. § 2254 ................................................................... 27, 28, 30

**Other Authorities**

Randall Kennedy, *Who Can Say 'Nigger'? . . . And Other Considerations*,
26 Journal of Blacks in Higher Education 86 (2000) .......................... 40

Mass. Guide to Evid. § 403 ...................................................................... 31

Mass. Guide to Evid. § 404 ...................................................................... 31

Gregory S. Parks & Shayne E. Jones, *Nigger: A Critical Race Realist
Analysis of the N-Word within Hate Crimes Law*, 98 J. Crim. L. &
Criminology 1305 (2007-2008) ........................................................... 40

Gary Suarez, *When Latinx People Use the N-Word*, N.Y. Times, Oct. 17,
2019 ...................................................................................................... 40

**Rules**

1st Cir. R. 22.0 ........................................................................................ 20

Fed. R. App. P. 3 ........................................................................ 15, 19, 22

Fed. R. App. P. 4 ........................................................................ 19, 20

Fed. R. Civ. P. 6 ..............................................................................24

Fed. R. Civ. P. 59 ............................................................................24

Fed. R. Evid. 403 ........................................................ 15, 32, 33, 38

Fed. R. Evid. 404 ............................................................. 15, 32, 37

Rules Governing § 2254 Cases, Rule 11 .........................................20, 21

**Constitutional Provisions**

U.S. Const. amend. XIV .............................................................2

## Jurisdictional Statement

This is an appeal from the denial of a petition for a writ of habeas corpus, which this Court has jurisdiction to hear under 28 U.S.C. § 2253. Petitioner-Appellant, Mario Cruzado, was sentenced to life in prison for murder by the Suffolk County Superior Court on December 19, 2012. (App. 7.) He filed a motion for a new trial on July 1, 2016, which was denied by the trial court judge on March 30, 2017. (App. 8.) The Supreme Judicial Court ("SJC"), the highest court of Massachusetts, affirmed his conviction and the denial of his motion for a new trial on August 10, 2018. *See Commonwealth v. Cruzado*, 480 Mass. 275, 103 N.E.3d 732 (2018) (Add. 21-37.)

On November 13, 2018, Cruzado filed his pro se petition for a writ of habeas corpus in the District Court, which had jurisdiction under 28 U.S.C. § 2241. (*See* App. 13.) The District Court denied this petition on November 3, 2021 (Add. 7), and issued a certificate of appealability under 28 U.S.C. § 2253(c) with respect to one issue on January 4, 2022. (Add. 20.) Cruzado filed a notice of appeal that same day. (App. 107.) In response to this Court's order (App. 109), additional briefing regarding the bases for jurisdiction is provided below. *See infra* Part I.

1

## Statement of the Issue

1. Whether Petitioner-Appellant is entitled to the writ of habeas corpus because the erroneous admission of a recording in which he used a highly inflammatory racial epithet rendered his trial fundamentally unfair, thus denying him due process of law, in violation of the Fourteenth Amendment of the Constitution of the United States.

## Statement of the Case[1]

This case is about the power of a single uniquely repugnant term, two syllables that the shameful parts of our nation's history have imbued with an unparalleled potential to create offense and anger: the n-word. Near the end of a heated and frustrating police interrogation, Petitioner-Appellant Mario Cruzado made the mistake of using this word. At trial, the prosecution then exploited that single moment to paint Cruzado as a racist and to inject racial animus into a case from

---

[1] The facts are drawn from the trial transcripts (citations to T_:_ are by volume and page number) and other documents in the record. Recognizing this Court's deference to state court factfinding, this summary is intended to be consistent with the SJC's statement of facts, *see Commonwealth v. Cruzado*, 480 Mass. 275, 276-77, 103 N.E.3d 732, 736 (2018), while providing additional relevant details.

which it was otherwise entirely absent. Despite a complete lack of physical evidence linking Cruzado to the crime scene and an obvious alternative culprit, Cruzado was convicted and sentenced to life in prison without the possibility of parole. Because this highly prejudicial evidence rendered his trial fundamentally unfair, Cruzado now seeks the writ of habeas corpus.

Frederick Allen III was found dead in his apartment in Chelsea on November 26, the Friday after Thanksgiving, in 2010. (T5:20.) He had a belt wrapped around his neck and had suffered blunt force trauma to his head; a broken glass vase found near his body was evidently the source of that injury. (T4:122-23, 220; T5:21.) Allen was a gay, Black man. (T3:88-89.)

Allen's apartment was the lower unit in a two-family house. (T2:113-14.) His landlord, who lived above him, had gone out grocery shopping around 7:30 P.M. on Wednesday, November 24. (T2:124.) When she returned about an hour later, she found that the glass in a door providing access to a back porch had been smashed. (T2:128-29.) She knocked on Allen's door but got no response. (T2:131-32.) Several hours later, she called the police, who came and took a report about the

broken glass. (T2:149-50.) Around midnight, she heard a door open and close in the common front hall of the house. (T2:140.)

During the police investigation of the killing, suspicion first focused on Allen's boyfriend, Jaime Hernandez. Hernandez was an alcoholic; he and Allen also both used crack cocaine. (T3:62-63, 72.) The relationship had lasted slightly over a year. (T3:58.) It was occasionally abusive: approximately one month prior to Allen's death, a home health aide employed by Allen saw Hernandez hit Allen in the face. (T6:15-16.) Hernandez had a record of criminal convictions, and Allen had previously filed reports with police accusing Hernandez of stealing from him. (T3:56, T5:143-45.)

Chelsea police initially interrogated Hernandez on Friday night, after the discovery of Allen's body. (T3:103-05.) At first, Hernandez was untruthful in his responses to questions, denying that he had any romantic relationship with Allen. (T3:106-08, T5:27.) After being confronted with evidence of the relationship, Hernandez changed his story and gave the police an account of the two previous days—an

account that, for the first time, connected Cruzado to the case.[2] (T5:31-32.)

Hernandez claimed that he encountered Cruzado on the street in Chelsea on Wednesday. (T3:78.) The two had known each other casually more than a decade before. (T3:76-78.) Around midday, the two men went back to Allen's apartment, where they drank with Allen. (T3:78-81.) Allen and Cruzado also apparently smoked crack cocaine. (T3:86-87.) Cruzado and Hernandez stayed for about thirty to forty minutes, after which Hernandez walked Cruzado to a bus stop so that Cruzado could take a bus into Boston. (T3:87, 91-92.) Hernandez then returned to Allen's apartment, but an argument ensued and Hernandez left. (T3:94-97.) He once again ran into Cruzado, who was still on the street in Chelsea. (T3:98-99.) Hernandez himself went to Boston and spent the next two days at a friend's house and with his mother. He claimed to have had no further contact with Allen before his death. (T3:99-103.) The State Trooper interviewing Hernandez did not, at the time, believe that Hernandez was telling the truth, and later testified that he

---

[2] This account given in the later part of Hernandez's first interview with police was consonant in its essentials with Hernandez's testimony at trial, summarized below.

believed "[v]irtually everything [Hernandez] was telling [him] was a lie." (T5:35, 105.) During their investigation, police also learned that on Saturday, November 27, Hernandez allegedly argued with another friend, whom he grabbed by the throat during their altercation. (T3:233.)

Eleven days later, on December 7, 2010, after details of Allen's death had been published in local news sources, Hernandez reappeared of his own volition at the Chelsea police station and made a second statement. (T5:124.) He claimed that on the previous day he had encountered Cruzado yet again by chance in the street in Chelsea and that Cruzado had said to him, "I'll choke you like I did your friend." (T3:141-42.) Hernandez did not react to this spontaneous confession at the time. (*Id*.) The following day, the day of his police statement, Hernandez went to see a friend at his apartment on the third floor of a nearby building. (T3:145, 148.) When the friend did not appear to be home, Hernandez waited on the landing. (T3:149.) Suddenly, he heard Cruzado on the stairs on a lower floor, out of Hernandez's sight, talking on the phone in a combination of English and Spanish. (T3:150-52.) In particular, Hernandez claimed that he heard Cruzado say that he

"blacked out" and then found his "arm around someone's neck" and that Cruzado used the Spanish word for "belt." (T3:152-53.) Hernandez believed that Cruzado was speaking to a woman. (T3:154.) Hernandez then walked down the stairs—directly past Cruzado but without making contact with him—and went to the police station. (T3:155-56.)

After hearing Hernandez's statement, police went to the building where he had been and discovered Cruzado asleep on the stairs. (T4:80-83.) Cruzado was taken to the police station and questioned. (T4:95-96.) He said that he had run into Hernandez on the street in Chelsea the Wednesday before Thanksgiving, but denied going anywhere with Hernandez or ever going inside a house that day. (App. 45-48, 53-54.) He also denied knowing anyone by Allen's name or recognizing Allen's photograph. (App. 68, 73-74.) Under repeated, circuitous questioning, Cruzado became increasingly frustrated. Not long after being shown the photograph, he stated, "I don't want to talk to you." (App. 86.)

A cell phone that had been found next to Cruzado on the stairs was meanwhile seized and analyzed, revealing that the last phone call placed on December 7, shortly before Hernandez appeared at the police station, was to Hilda Matiaz, a former girlfriend of Cruzado. (T4:90,

7

T5:65-69.) Police did not question Matiaz until March 2011, after she had been arrested for drunk driving in February 2011. (T4:13, 17.) She told police that Cruzado had called her on December 7 to tell her about an incident in which he had met up with a friend and gone to the home of a Black man, where he had showered and then fallen asleep in his boxers. (T3:269-71.) When he awoke to the Black man touching his testicles, he reacted by pushing the man away, putting him in a headlock, and saying that he was "not a faggot." (T3:271-72.) The man fell to the floor, and Cruzado left. (T3:272-73.) The defense theory at trial was that some or all of this story had been suggested to Matiaz by police, who had delayed questioning her until she was facing criminal charges herself. (T6:39-40.)

The police also obtained a record of phone calls made from Allen's home phone on November 24. (T5:95-99.) The last outgoing calls were made at 7:05 P.M. and 7:19 P.M. to two different numbers in Montreal, where Allen's ex-husband lived.[3] (*Id.*) Between 5:57 P.M. and 6:44 P.M.,

---

[3] There was no testimony about the content of these calls at trial, but police apparently interviewed Allen's ex-husband, who claimed that Allen had told him that Hernandez has brought someone to the apartment; that Allen and Hernandez had subsequently fought and

five outgoing calls were made to Matiaz. (*Id.*) There was no evidence of Allen calling Matiaz before, and Matiaz testified that she did not know Allen. (T4:25.) She did not testify about who made the calls to her or what was said during the calls. At trial, the defense suggested that Cruzado could have given Allen Matiaz's number, but was not permitted to argue that Matiaz, who had a prior conviction for heroin possession, was a drug dealer and could have been contacted by Allen for that reason. (T2:13-18, T6:38.)

The Commonwealth presented no forensic evidence that Cruzado had ever been in Allen's apartment. Cruzado was in fact excluded as a source of DNA from samples taken from the belt and the vase involved in Allen's death. (T4:202.) Dried blood on clothes worn by Cruzado at the time of his interrogation—which Hernandez had claimed was the same clothing Cruzado had worn the day he and Cruzado went to Allen's apartment—turned out to be Cruzado's own. (T4:143, 196; T5:49-51.) A shoeprint found on the broken glass did not match Cruzado's shoe. (T6:28.)

---

Hernandez had left; and that the other individual had returned, asked the victim to have sex, then left after the victim had refused. (App. 89.)

A recording of Cruzado's December 7 interview with police was played, with some redactions, at trial. (T5:57-58.) One portion that was not redacted was the following exchange, which occurred when the Trooper presented Cruzado with a photograph of Allen:

> Q: I'm going to show you a picture of a guy. See if you've ever seen this guy before.
> A: Who's that?
> Q: I'm asking you. Isn't this—I'm asking you. Have you ever seen this guy before? Yes or no?
> A.: Who the fuck is that? Just a guy?
> Q.: No, listen to me. Listen to me. Have you ever seen this guy before? Yes or no.
> A.: He looks like a nigger to me.
> Q.: Have you ever seen this guy before?
> A.: He looks like a nigger to me.
> Q.: Have you ever seen this guy right here before?
> A.: He looks like a nigger to me. No. He's black.
> Q.: No. It's a yes or no question.
> A.: He's black.
> . . .
> Q.: Yes or no?
> A.: Where the fuck I've ever seen him? I don't know that mother fucker.

(Add. 39-40; App. 73-74.)

The defense filed a motion in limine to exclude this portion of the recording, but the Court allowed the evidence as relevant to a racist motive for the killing. (T1:24-28.) Defense counsel objected, noting—accurately—that aside from the exchange, "nothing in the case point[ed]

to racial motive whatsoever." (T1:26.) The Court disagreed with defense counsel, explaining that the evidence "goes to the motive. Your client is I think going to allege that he was the victim of a homosexual advance by a man that he calls a nigger." (T1:27.) The Court concluded that the racial epithet "adds to his motive . . . . It's not only a gay man, possibly a transvestite . . . but also an African-American man. All three biases come to play in this alleged incident." (*Id.*)

In light of the pre-trial ruling that Cruzado's use of the n-word was admissible, the judge questioned jurors during voir dire about whether hearing the n-word would affect their impartiality. The judge did so, however, by inquiring about this point "in terms of the race question." (T1:29.) The resulting question was as follows: "The defendant is Hispanic, the alleged victim was African-American. You will also hear evidence that the defendant allegedly referred to the alleged victim as a nigger. Do *you* have any feelings *based on race* that might affect your ability to be fair and impartial?" (T1:50-51 (emphasis added).)

The prosecutor made pointed reference to Cruzado's use of this racially-charged term at the end of her opening statement. After

warning the jury that Cruzado would "absolutely deny in that interview ever knowing Fred Allen," she focused their attention instead on the epithet. "His exact words: 'I don't know that nigger.' Those were the words he used," she stressed, not making use of any euphemism (like "n-word") herself—and, in fact, misquoting Cruzado, who did not use the precise phrase she attributed to him. (T2:72; *cf.* Add. 39-40; App. 73-74.) She returned to the word again in the climax of her closing argument to the jury: "[T]he second this Fred Allen, this nigger and a faggot, decided to make a sexual advance on him and grab his testicles, well the fun was over because that is when, ladies and gentleman, the defendant attacked Fred Allen." (T6:60.) The prosecutor also implicitly relied on the race-based language to cast Cruzado's interview—in which he repeatedly denied involvement—as inculpatory: "[Hernandez] didn't do this. The defendant did. You know it from the phone records, you know it from his own words, you know it from his statements to the police." (T6:62.)

The jury convicted Cruzado of first-degree murder on a theory of deliberate premeditation only. (T6:111-12.) Cruzado filed a motion for a new trial on July 1, 2016, which was denied by the trial court judge on

March 30, 2017. (App. 8.) The SJC affirmed his conviction and the denial of his new trial motion on August 10, 2018. *See Cruzado*, 480 Mass. 275, 103 N.E.3d 732. (Add. 21.) On November 13, 2018, Cruzado filed his pro se petition for a writ of habeas corpus in the District Court. (App. 13, Dkt. No. 1.) After appointing counsel, the District Court considered and denied Cruzado's petition on November 3, 2021, resulting in its dismissal. (Add. 7-19; App. 15, Dkt. Nos. 38-39.) As discussed further below, in the order denying the habeas petition, the court did not decide whether to grant a certificate of appealability under 28 U.S.C. § 2253(c), but gave Cruzado a further thirty days to brief the issue of whether a certificate was warranted. (*Id*.) On November 30, 2021, Cruzado sought a seven-day extension of time for the deadline "for filing his Memorandum of Law in Support of Issuance of Certificate of Appealability," which was allowed. (App. 15, Dkt. Nos. 40-41.). He then timely filed his memorandum on December 9, 2021. (App. 15, Dkt. No. 42.)

On January 4, 2022, the District Court granted a certificate of appealability on the single issue now presented for this Court's review: whether the admission of the portion of the recorded interrogation in

which Cruzado used the n-word rendered his trial fundamentally unfair, thus denying him due process of law. (Add. 20, *cf*. 11; App. 16, Dkt. No. 43.) Cruzado's notice of appeal was filed that same day, on January 4, 2022. (App. 16, Dkt. No. 44.) The appeal was docketed in this Court on January 12, 2022. (App. 19.) On March 21, 2022, this Court ordered Cruzado to show cause why the appeal should not be dismissed as untimely; Cruzado responded the following day, on March 22, 2022. (*Id*.) On December 16, 2022, this Court issued a further order allowing the appeal to proceed but requesting further briefing on timeliness. (*Id*.)

## Summary of Argument

This Court has jurisdiction to hear Cruzado's appeal. His notice of appeal was timely: habeas rules and this Court's local rules require that a final ruling on a petition for a writ of habeas corpus contain a decision on appealability. Here, the District Court's decision denying habeas corpus was contingent and explicitly invited further briefing on appealability. As such, the District Court only issued a "final order" pursuant to the rules that apply to habeas proceedings when it issued its order on the certificate of appealability, and Cruzado timely filed a

14

notice of appeal upon receipt of that order. In the alternative, this Court has jurisdiction because Cruzado's timely motion for an extension of time to brief the question of appealability was—as several courts of appeal have already recognized—the functional equivalent of a notice of appeal. Treating his motion as such is consistent with the Supreme Court's instruction to liberally construe the requirements of Rule 3 of the Federal Rules of Appellate Procedure.

As to the merits, Cruzado's petition for a writ of habeas corpus should be granted. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) permits federal courts to grant habeas relief to petitioners who have exhausted available state proceedings and received a state court decision on the merits that involved an "unreasonable application" of "clearly established federal law." Cruzado appropriately exhausted his state court remedies by bringing his federal due process claim to the Massachusetts Supreme Judicial Court.

This Court has recognized that serious evidentiary errors that result in a fundamentally unfair trial can provide a basis for habeas relief, especially where such errors infuse the trial with inflammatory prejudice. Rules 403 and 404(b) of the Federal Rules of Evidence—and

15

their state analogues—embody fundamental due process principles, and the erroneous application of those principles can infect a trial with such unfairness that the resulting conviction is a denial of due process.

The SJC's decision was an unreasonable application of due process principles. First, the SJC dismissed Cruzado's due process claim in a single-sentence footnote that misstated the law by erroneously suggesting that due process concerns never arise where the prejudicial evidence comes from a defendant's own statements. Second, the SJC failed to consider the degree of unfair prejudice that Cruzado experienced when the unredacted recording was admitted: the SJC did not address the degree to which the n-word offends or the fact that because it was the only evidence of racial animus, its admission injected race into a trial that did not otherwise have an explicit racial dimension. Instead, the SJC concluded that prejudice was mitigated by a voir dire question about the n-word, but that question was insufficient because it confusingly conflated jurors' "feelings based on race" generally with their response to Cruzado's use of the n-word. Third, the unfairly prejudicial recording had minimal probative value: the defense, which maintained Cruzado's innocence, raised no argument to which

the n-word recording was responsive—indeed, the trial court's decision to admit the evidence in the first place was based on the belief that the defense would make a justifiable homicide argument, which it did not. Moreover, the recording could easily have been redacted to remove this information: the recording was redacted in other respects and truncated such that it stopped before Cruzado invoked his right to remain silent.

Admitting the unredacted recording had a substantial and injurious effect or influence on the jury verdict. The evidence in this case was close: the forensic testing was exculpatory, Allen's boyfriend was a highly-plausible alternate suspect, and the defense had reasonable theories to cast doubt on the limited evidence that linked Cruzado to the crime. Given the absence of other evidence of racial animus, the unconstitutional admission of the inflammatory racial epithet likely had a substantial and injurious effect or influence on the jury's verdict. As such, the writ should issue.

# Argument

## I.    Jurisdiction

The District Court denied Cruzado's petition for a writ of habeas corpus on November 3, 2021, without issuing a final ruling on the issuance of a certificate of appealability. (Add. 7-18; App. 15, Dkt. No. 38.) Instead, the District Court indicated that while it was "not inclined to issue a certificate of appealability," Cruzado would have thirty days "to file a memorandum, if he seeks to address the issue of whether a certificate of appealability is warranted as to either or both grounds in the Petition." (Add. 17.) On November 30, 2021, Cruzado sought a seven-day extension of the deadline "for filing his Memorandum of Law in Support of Issuance of Certificate of Appealability." (App. 15, Dkt. No. 40.) The motion was allowed without opposition, and Cruzado timely filed his memorandum on December 9, 2021. (App. 15, Dkt. No. 41-42.) On January 4, 2022, the District Court granted a certificate of appealability as to one of the two issues raised by Cruzado, and that same day, Cruzado filed his Notice of Appeal. (Add. 20; App. 16, Dkt. Nos. 43-44.)

Given that no formal notice of appeal was filed within thirty days of the District Court's initial order denying Cruzado's habeas petition, this Court requested further briefing on appellate jurisdiction. (App. 109.) This Court has jurisdiction for two reasons. First, the Notice of Appeal filed on January 4, 2022, was in fact timely, as the November 3, 2021, order was not the "final order" from which the appeal was taken pursuant to the rules for habeas and this Court's local rules. Second, in the alternative, Cruzado's motion for an extension of time to brief the question of appealability was the functional equivalent of a Notice of Appeal and thus satisfied Rules 3 and 4 of the Federal Rules of Appellate Procedure, giving this Court jurisdiction.

## A. The District Court's initial order denying a writ of habeas corpus and providing thirty days to address appealability was not a "final order" in the context of a habeas proceeding because it did not comply with habeas rules or this Court's local rules

The District Court's order on November 3, 2021, denying a writ of habeas corpus was not a "final order" from which Cruzado was required to file a notice of appeal. Although this Court has jurisdiction to review a district court's "final order" in a habeas proceeding, 28 U.S.C. § 2253(a), there is no automatic right of appeal, 28 U.S.C. § 2253(c). To

pursue an appeal to the court of appeals, a habeas petitioner must obtain a certificate of appealability. 28 U.S.C. § 2253(c).

Rule 11(a) of the Rules Governing Section 2254 Cases [hereinafter "Habeas Rules"] requires a District Court to either "issue or deny a certificate of appealability *when it enters a final order* adverse to the applicant." *Id.* (emphasis added). The First Circuit's Local Rules likewise require a "district judge to rule on the issuance of a certificate of appealability *when* a final order issues." 1st Cir. R. 22.0(a) (emphasis added). Only after a final order enters "under these rules"—that is, after a final order enters that includes a decision to issue or deny a certificate of appealability—must a habeas petitioner file a notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a) . *See* Habeas Rules, Rule 11(b).

Therefore, the District Court's order on November 3, 2012, was not a "final order" as contemplated under the relevant habeas rules, because the District Court did not decide whether to issue a certificate of appealability.[4] Instead, the Court gave its contingent view that it was

---

[4] A one-sentence "Order of Dismissal," also issued on November 3, 2021, by the Deputy Clerk, did not take into account this crucial nuance of the District Court's order or the rules regarding habeas. (Add. 19).

"not inclined to issue a certificate of appealability," and set forth a

briefing schedule on appealability. (Add. 17; App. 15, Dkt. No. 38.) Such

action is explicitly contemplated by and consistent with the Habeas

Rules, which note that "*[b]efore entering the final order*, the court may

direct the parties to submit arguments on whether a certificate should

issue." Habeas Rules, Rule 11(a) (emphasis added). The District Court

did just that here, inviting Cruzado to file a memorandum concerning a

certificate of appealability. (Add. 17; App. 15, Dkt. No. 38.) Thus, the

District Court issued its "final order—as that term is construed by the

rules that apply to habeas—only on January 4, 2022, when it ruled on

the question of a certificate of appealability. (App. 16, Dkt. No. 43.)

Cruzado filed his notice of appeal that day, and his appeal is therefore

timely.

### B. In the alternative, the motion for extension of time to brief appealability, filed within thirty days of the District Court's order denying a writ of habeas corpus, was the functional equivalent of a notice of appeal

Even if the District Court's Order on November 3, 2021, denying a

writ of habeas corpus, was the "final order" for purposes of 28 U.S.C.

§ 2253(c), Cruzado's timely motion for additional time to submit a

memorandum concerning a certificate of appealability is the functional

equivalent of a notice of appeal. As such, it is sufficient to provide this Court jurisdiction.

A party pursuing an appeal must file a notice of appeal specifying the party taking the appeal, the judgment from which the appeal is taken, and the court to which the appeal is taken. Fed. R. App. P. 3(c); *Bowles v. Russell*, 551 U.S. 205, 209 (2007) (filing of notice of appeal required for appellate court to have jurisdiction). The Supreme Court has instructed lower courts to "liberally construe the requirements of Rule 3." *Smith v. Barry*, 502 U.S. 244, 248 (1992). "[W]hen papers are 'technically at variance with the letter of [Rule 3], a court may nonetheless find that the litigant has complied with the rule if the litigant's action is the functional equivalent of what the rule requires.'" *Id.* (quoting *Torres v. Oakland Scavenger Co.*, 487 U. S. 312, 316-17 (1988)). The requirement is simply meant "to ensure that the filing provides sufficient notice to other parties and the courts. Thus, the notice afforded by a document . . . determines the document's sufficiency as a notice of appeal." *Smith*, 502 U.S. at 248; *see also* Fed. R. App. P. 3(c)(7) ("[a]n appeal must not be dismissed for informality of form or

22

title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise clear from the notice").

This Court has also held that Rule 3's requirement "may be satisfied by the filing of the 'functional equivalent,' so long as it gives the pertinent information and evinces an intention to appeal." *Campiti v. Matesanz*, 333 F.3d 317, 320 (1st Cir. 2003).[5] Applying this principle, several courts of appeals have concluded that a motion for extension of time to request a certificate of appealability is the functional equivalent of a notice of appeal. For instance, in *Wells v. Ryker*, 591 F.3d 562, 565 (7th Cir. 2010), the Seventh Circuit concluded that the petitioner's request—through counsel—for an extension of time to file a motion for a

---

[5] One older First Circuit case holds that a motion for extension of time to file a notice of appeal is not sufficient to give an appellate court jurisdiction. *See Thomas v. Morton Int'l, Inc.*, 916 F.2d 39, 40 (1st Cir. 1990) (per curiam). *Thomas* is distinguishable because it was not a habeas case, and because a request for more time to file the notice of appeal—a simple document for a party to prepare and file—itself casts doubt on a party's intent to appeal in a way in which a request for more time to file a substantive memorandum in support of a certificate of appealability does not. Crucially, *Thomas* was also decided before the Supreme Court's decision in *Smith v. Barry*, 502 U.S. 244, 248 (1992), which may have implicitly overruled it. *See Campiti v. Matesanz*, 333 F.3d 317, 320 n.3 (1st Cir. 2003) ("We have no reason here to consider whether [*Thomas*'s] conclusion survives *Smith*").

certificate of appealability[6] was sufficient to preserve the court's jurisdiction. The notice specified the party taking the appeal and the order being appealed, and "while it did not specify the court to which the appeal is being taken," the court concluded that "the intent to appeal to this court is obvious—the term 'certificate of appealability' necessarily refers to an appeal to the relevant court of appeals." *Wells*, 591 F.3d at 565; *see also United States v. Gooch*, 842 F.3d 1274, 1277 (2016) (request for extension of time to apply for certificate of appealability met jurisdictional requirements of Rule 3(c)); *Clark v. Cartledge*, 829 F.3d 303, 305 (4th Cir. 2016) (similar).

Here, Cruzado's motion for extension of time was the "functional equivalent" of a proper notice of appeal, because it supplied the "pertinent information" and showed "an intention to appeal." *See Campiti*, 333 F.3d at 320. The name of the party taking the appeal, the

---

[6] The *Wells* petitioner filed a motion for an extension of time to file either a motion for a certificate of appealability *or* a motion for reconsideration. The Seventh Circuit specifically noted that in concluding that the motion was sufficient to preserve jurisdiction, the court was not relying on the motion for an extension of time to file a motion for reconsideration, because an extension of time for a motion under Fed. R. Civ. P. 59(e) is barred by Fed. R. Civ. P. 6(b)(2). *Wells*, 591 F.3d at 564.

Petitioner-Appellant, was included in the caption of the motion in the standard form for any motion filed. (App. 105.). The order being appealed from was made clear by including the District Court docket number on the motion. (*Id*.) Only one substantive decision had been made by the Court in the case, namely the denial of the habeas petition; the motion for extension of time was the next filing on the docket after this denial and a companion order dismissing the case. (App. 15; Add. 7-19.) There was, in other words, nothing to appeal from other than the District Court's November 3 order, which specifically granted Cruzado time to brief the issue of appealability. *See O'Brien v. Town of Bellingham*, 943 F.3d 514, 526 (1st Cir. 2019) (in considering sufficiency of Notice of Appeal, court considers "the appellant's intent on the record as a whole"). Although the motion does not explicitly name the court to which the appeal was taken, "failures to meet this requirement are excused where there is only one court to which the appeal can be taken, which is the case here." *Gooch*, 842 F.3d at 1277 (citing *Anderson v. District of Columbia*, 72 F.3d 166, 168-69 (D.C. Cir. 1995)). Finally, Cruzado's overall intent to appeal is clear: after all, "[t]here would be little reason for [him] to request an extension of time to properly file a

certificate of appealability if he did not intend to appeal." *Clark*, 829 F.3d at 306.

In past cases, this Court has accorded the highest level of flexibility in complying with Rule 3 to pro se litigants. *See United States v. Rodriguez-Rosado*, 854 F.3d 122, 125 (1st Cir. 2017) (holding that letter requesting appointment of counsel was functional equivalent of notice of appeal under "liberal construction of Rule 3 that we afford pro se litigants"). Here Cruzado is incarcerated for life, and his habeas petition was originally filed pro se. Although Cruzado had been appointed counsel by the time the motion for an extension of time was filed, this should not deprive him of the benefit of a liberal construction of Rule 3. *See Wells*, 591 F.3d at 564 (petitioner filed motion for extension of time through appointed counsel); *Ortberg v. Moody*, 961 F.2d 135, 137 (9th Cir. 1992) (rule that request for certificate of probable cause, predecessor to certificate of appealability, is equivalent to notice of appeal was originally articulated in case involving pro se petitioners, but "is equally applicable to petitioners proceeding through counsel"). As such, this Court should conclude that the motion for an extension of time to submit a memorandum concerning a certificate of

appealability was the functional equivalent of a notice of appeal for the purpose of establishing jurisdiction.

## II.    The Writ of Habeas Corpus Should Issue

This Court should issue the writ of habeas corpus for Cruzado because the admission of the unredacted recording in which he used the n-word rendered his trial fundamentally unfair, thus violating his right to due process of law under the United States Constitution. His petition moreover meets the standards for habeas relief set out in AEDPA, because the state court's analysis was an unreasonable application of clearly-established federal law. *See* 28 U.S.C. § 2254.

The admission of the unredacted video violated basic principles of both state and federal evidentiary law that limit the use of character evidence and evidence the probative value of which is substantially outweighed by the potential for unfair prejudice. These evidentiary principles reflect underlying, clearly-established guarantees that criminal defendants should receive fair trials and due process of law. Cruzado presented this argument to the SJC, but the court affirmed his conviction, disposing of the due process argument in a single, patently unreasonable footnote. The unusually close state of the evidence in the

case moreover suggests that the admission of the recording containing inflammatory racial language likely had "a substantial and injurious effect or influence on the jury's verdict." *See Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993). The writ should issue.

## A. Standard of review

AEDPA permits federal courts to grant habeas relief to petitioners who have exhausted available state proceedings and received a state court decision on the merits that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(b)-(d). Where AEDPA's standard is met, this Court must grant habeas relief if a preserved constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Barbosa v. Mitchell*, 812 F.3d 62, 68 (1st Cir. 2016) (quoting *Brecht,* 507 U.S. at 637.). The burden of establishing harmlessness under this standard is on the state, and "[i]f the habeas court entertains 'grave doubt as to harmlessness, the petitioner must win.'" *Foxworth v. St. Amand*, 570 F.3d 414, 436 (1st Cir. 2009) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995)).

Although AEDPA's requirements encourage deference to state court decisions, this "deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "There is no need for there to be a Supreme Court case on all fours for a state decision to be unreasonable" for purposes of AEDPA. *Evans v. Thompson*, 518 F.3d 1, 7 (1st Cir. 2008) (citing *White v. Coplan*, 399 F.3d 18, 25 (1st Cir. 2005)). Rather, it suffices "'if the Supreme Court's general principles can be discerned and if, respectfully but with confidence,' the federal court concludes that the state court unreasonably applied federal law." *Id.*; *see Williams v. Taylor*, 529 U.S. 362, 407 (2000) (AEDPA's "unreasonable application" prong applies where state court "unreasonably refuses to extend [a principle from Supreme Court precedent] to a new context where it should apply").

Finally, this Court owes no deference to the District Court's denial of Cruzado's petition. "Where the district court in a federal habeas case does not undertake independent factfinding, as was the case here," this Court must "review the district court's entire decision, including its application of the AEDPA standard, de novo." *Rivera v. Thompson*, 879 F.3d 7, 13 (1st Cir. 2018).

## B. Cruzado has exhausted his state court remedies

Cruzado has fulfilled AEDPA's requirement that he first "exhaust[] the remedies available in the courts of the State" before seeking federal habeas. *See* 28 U.S.C. § 2254(b)(1)(A). The admission of the unredacted recording of his interrogation was a central issue in his direct appeal to the SJC, the highest court of Massachusetts. *See Cruzado*, 480 Mass. at 277-79, 103 N.E.3d at 736-738. The SJC primarily addressed the issue under the state's common law of evidence. *Id*. But Cruzado also presented his constitutional argument, which the SJC rejected in a one-sentence footnote alluding to Cruzado's "due process rights." *Id*. at 279 n.2. As such, Cruzado exhausted his due process claims before the SJC. *See Fortini v. Murphy*, 257 F.3d 39, 44 (1st Cir. 2001) (exhaustion requires petitioner to "make it probable that a reasonable jurist would have been alerted to the existence of the federal question").

## C. Admitting the unredacted recording in which Cruzado repeatedly used a racial epithet violated due process and rendered Cruzado's trial fundamentally unfair

Habeas relief is warranted in this case because the admission of the unredacted recording resulted in a trial that was fundamentally

unfair, in violation of Cruzado's constitutional right to due process of law. The portion of the unredacted recording in which Cruzado used the n-word constituted inadmissible character evidence that was both highly prejudicial to Cruzado and of minimal probative value. The SJC's approval of its admission was therefore an unreasonable application of clearly-established due process law.

### 1. Serious evidentiary errors can warrant habeas relief.

A "misbegotten evidentiary ruling that results in a fundamentally unfair trial may violate due process and, thus, ground federal habeas relief." *Coningford v. Rhode Island*, 640 F.3d 478, 484 (1st Cir. 2011). If the state evidentiary error "so infuse[s] the trial with inflammatory prejudice that it renders a fair trial impossible," constitutional error has occurred. *Gomes v. Silva*, 958 F.3d 12, 24 (1st Cir. 2020) (quoting *Lyons v. Brady*, 666 F.3d 51, 56 (1st Cir. 2012)). *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair," Due Process Clause provides relief).

Here, the state trial court judge admitted the recording under a principle of state evidentiary law analogous to that codified in Fed. R.

Evid. 404(b) (evidence of "other crime, wrong, or act" not admissible as propensity evidence, but may be admissible to prove motive). *See* Mass. Guide to Evid. § 404(b). The admission of any evidence is also always subject to the general balancing test found in Rule 403 of the Federal Rules of Evidence (relevant evidence may be excluded if probative value is substantially outweighed by danger of unfair prejudice). *See* Mass. Guide to Evid. § 403. Although errors of state law, including misapplication of evidentiary rules, are "not enough to warrant federal habeas relief," they still may be considered as "part and parcel of the overarching constitutional claim" brought by a habeas petitioner. *Coningford*, 640 F.3d at 484 n.4.

The principles embodied in Rules 403 and 404 and their state analogues are grounded in fundamental due process principles. In particular, "the use of 'other acts' evidence as character evidence . . . is contrary to firmly established principles of Anglo-American jurisprudence." *McKinney v. Rees*, 993 F.2d 1378, 1380 (9th Cir. 1993). The balancing test in Rule 403, moreover, has been recognized as a crucial safeguard to prevent the admission of unfairly prejudicial evidence under Rule 404(b). *Huddleston v. United States*, 485 U.S. 681,

691 (1988); *see United States v. Wells*, 879 F.3d 900, 930 (9th Cir. 2018)
(holding that "district court's erroneous admissions and failure to
engage in Rule 403 balancing so infected the trial with unfairness as to
make the resulting conviction a denial of due process") (citations and
internal quotations omitted). Disregard of these rules may thus create
"fundamental unfairness" that amounts to a denial of due process. Such
was the case at Cruzado's trial.

### 2. The Supreme Judicial Court's decision was an unreasonable application of due process principles.

The SJC unreasonably applied clearly-established federal law
when it rejected Cruzado's due process argument. The SJC dismissed
the argument in a single sentence in a footnote: Cruzado's "argument
that the admission of the word 'nigger' as evidence of racial animus
violated his due process rights is unavailing, as the word came from his
own mouth several times." *Cruzado*, at 279 n.2, 738 n.2. The SJC cited
no authority for the premise that admission of a defendant's statements
cannot ground a due process claim—nor could it have, as this is
emphatically not the law.

Admission of a defendant's statements violates due process under
any number of circumstances: for instance, if they are involuntary, *see*

33

*United States v. Lawrence*, 889 F.2d 1187, 1189 (1st Cir. 1989), or if

they are made by an individual in custody in violation of *Miranda v.*

*Arizona,* 384 U.S. 436 (1966). Due process concerns are not magically

eliminated simply because a word comes from the defendant's own

mouth. Where, as here, a state court's conclusion is so arbitrary and ill-

founded, the writ of habeas corpus must issue. *See Rivera v. Thompson*,

879 F.3d 7, 16 (1st Cir. 2018) (granting habeas where "no fair-minded

jurist could disagree that the Massachusetts Appeals Court's holding

was contrary to governing Supreme Court law").

### 3. The recording was unfairly prejudicial to Cruzado.

The SJC's decision also failed to analyze the degree of unfair

prejudice that Cruzado suffered from the admission of the unredacted

recording. The n-word, which Cruzado repeatedly used, has been called

"the most noxious racial epithet in the contemporary American lexicon."

*Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir.

1998). Admitting the portion of the recording in which the n-word was

heard was likely not only to personally offend Black jurors, but also to

powerfully call into question for all jurors Cruzado's moral character.

*See United States v. Gamory*, 635 F.3d 480, 493 (11th Cir. 2011)

(excluding as unfairly prejudicial rap video where lyrics "contained violence, profanity, sex, promiscuity, and misogyny").

Moreover, as defense counsel pointed out to the trial judge, there was no other evidence of a racial motive for Allen's murder, nor any other suggestion of racial animus on the part of Cruzado. Admitting the unredacted interrogation thus added a racial dimension to a case where previously there was none. "[C]ourts must not tolerate prosecutors' efforts gratuitously to inject issues like race and ethnicity into criminal trials." *United States v. Saccoccia*, 58 F.3d 754, 774 (1st Cir. 1995) (noting that doing so "may pose issues of constitutional dimension").

In its decision, the SJC did not comment on the uniquely offensive connotations of the n-word or the degree of prejudice that Cruzado was likely to suffer from the jury hearing him use this word. Instead, the court relied entirely on the judge's individual voir dire to "mitigate the prejudicial effect of the racial slur." *Cruzado*, 480 Mass. at 279, 103 N.E.3d at 738.

In concluding that the voir dire mitigated any potential prejudice, the SJC did not scrutinize the actual question the jury heard. The question about the n-word was tucked inside a longer query: "The

defendant is Hispanic, the alleged victim was African-American. You will also hear evidence that the defendant allegedly referred to the alleged victim as a nigger. Do you have any feelings based on race that might affect your ability to be fair and impartial?" (T1:50-51; *cf.* Add. 47, T1:28.) The question conflated two distinct and important issues: whether potential jurors harbored prejudices for or against the minority groups to which Cruzado and Allen belonged, and whether they were especially sensitive to racist language, such that hearing Cruzado use the n-word repeatedly might affect their ability to be impartial.

The inadequacy of the voir dire question wording, which ended by asking jurors whether they had "feelings based on race," is highlighted by the fact that in a few instances the judge spontaneously reframed the question when a potential juror's response underscored its ambiguity. For example, in response to one juror who responded to the standard question by saying that she "d[idn't] really like that terminology," the judge responded: "I don't think anybody does. The question is whether hearing [the n-word] would cause you to question your ability to be fair and impartial." (T1:245.) Such reframing was rare, however. The standard wording did not ask jurors whether hearing the n-word would

affect their impartiality, instead burying the issue under the larger question of racial prejudice and whether the jurors had "feelings based on race."

This flawed voir dire question was the only attempt to mitigate unfair prejudice to Cruzado from the admission of the recording.[7] Although the judge gave a limiting instruction after the recording was played, it addressed the other redactions to the recording only and did not reference Cruzado's use of the n-word. (T5:62-63.) Nor was the use of the n-word ever addressed in the judge's instructions to the jury before they began deliberations. The SJC merely noted that such an instruction was not requested and that a judge is not required to give such an instruction sua sponte. *Cruzado*, 480 Mass. at 279, 103 N.E.3d at 738.  This Court, by contrast, has stressed the importance of a "careful limiting instruction" in cases where potentially prejudicial evidence is admitted under Rule 404(b). *United States v. Smith*, 292 F.3d 90, 100 (1st Cir. 2002). *See United States v. Gonyer*, 761 F.3d 157,

---

[7] Given the problems with the voir dire question, posing this question concerning the n-word to every juror at the beginning of trial may have compounded the prejudice caused by admitting the underlying evidence, because the voir dire question effectively primed jurors to pay particular attention to this evidence.

164 (1st Cir. 2014) (trial court's Rule 403 balancing more likely to stand when "limiting instructions were deftly and timely deployed"). The absence of any instruction here compounded the fundamental unfairness to Cruzado stemming from the admission of the challenged portion of the recording.

### 4. The unfairly prejudicial portion of the recording had minimal probative value.

The SJC not only failed to consider the extent of the unfair prejudice Cruzado faced from the admission of the unredacted recording but also exaggerated the recording's probative value. "The Commonwealth offered the evidence to show the defendant's animus toward African-Americans, and thus as a partial motive for the killing." *Cruzado*, 480 Mass. at 279, 103 N.E.3d at 737. But the prosecution already had evidence of an entirely different potential motive, namely revulsion at a homosexual advance and homophobic prejudice more generally. (T3:271-73.) And the defense had not raised any specific argument to which the challenged portion of the recording was responsive. *Cf. United States v. Pena*, 24 F.4th 46, 64-66 (1st Cir. 2022) (approving of admission of video showing defendants "us[ing] racial and misogynistic epithets while discussing crimes unrelated to [the] case"

because relevant to refuting "mere presence" defense that counsel for the defendant put before the jury in closing argument, as well as other potential defenses).

The unreasonableness of the SJC's assessment here—to the point of violating due process—is apparent from its misapplication of state law on these very points. In considering the admission of the recording, the court relied primarily on *Commonwealth v. Bishop*, 461 Mass. 586, 963 N.E.2d 88 (2012), in which a white defendant shot and killed a Black man in the aftermath of a minor road-rage incident. At trial, the judge allowed the admission of his statement "Watch out, I'm in here for shooting a nigger" to a fellow prisoner in jail. 461 Mass. at 596, 963 N.E.2d at 96. The SJC there recognized the unique risk of "inflaming a jury's emotions" with the word, but nonetheless approved of the statement's admission given that it was specifically probative of both criminal responsibility, which the defendant had placed in issue, and motive, which was otherwise "unclear." 461 Mass. at 597, 963 N.E.2d at 97. In analogizing to *Bishop* in Cruzado's case, the SJC disregarded the fact that there was already an obvious motive and there was no defense to which racial animus would have been germane. Without any

problematic gap in the government's theory of the case, intimations of racism served only to inflame the jury.

The underlying trial court decision to admit the evidence likewise relied on a flawed analysis. The trial court concluded that the evidence was probative of motive based on its assessment that Cruzado "is I think going to allege that he was the victim of a homosexual advance by a man he calls a nigger," and that as such, the recording was probative of motive. (T1:27-28.) But Cruzado maintained his innocence and never suggested that he committed a "justifiable" homicide. Thus, the evidence was never even probative in the sense for which it was originally admitted.

The probative value of the evidence is further cast into doubt when Cruzado's specific socioethnic background is taken into account. Although the n-word is usually highly offensive, the sociology of its use is complex. *See generally* Randall Kennedy, *Who Can Say 'Nigger'? . . . And Other Considerations*, 26 Journal of Blacks in Higher Education 86 (2000). In particular, the word is not always perceived as offensive when used among Black Americans. *Id.* at 90 (noting n-word's "continued usage…by large numbers of black Americans"). The n-word

simply "has a different connotation when used intra-racially among Blacks than when directed at Blacks by Whites." *See* Gregory S. Parks & Shayne E. Jones, *Nigger: A Critical Race Realist Analysis of the N-Word within Hate Crimes Law*, 98 J. Crim. L. & Criminology 1305, 1306 (2007-2008) (noting "high rates of Black usage of the N-word" but arguing that hate crimes laws should not be applied to Black defendants based on their use of the word).

As a Hispanic-American (T1:6), of Puerto Rican ancestry, with mixed-race children and grandchildren, Cruzado participates in this complex linguistic situation. *See* Gary Suarez, *When Latinx People Use the N-Word*, N.Y. Times, Oct. 17, 2019 (noting "comfort many Latinx people have with saying the N-word and the right they claim to have in using it" and "complicated dynamic between two marginalized groups"). Cruzado's use of the n-word is additionally complicated by the fact that his native language is Spanish. The n-word in English is in fact ultimately derived from the Spanish word for the color black, *negro*.[8] Kennedy, at 86. The proximity of the English term to an ordinary and

---

[8] Indeed, this Spanish word, *Negro*, was Cruzado's childhood nickname.

non-offensive word in Cruzado's native tongue likewise suggests that his use of the n-word was not probative of racial animus.

In any event, it would have been straightforward to play for the jury only the first three-quarters of the recording, in which Cruzado admitted that he had been in Chelsea on November 24 and had encountered Hernandez on the street. This was not a case where redaction would have been impractical. *Cf. United States v. Price*, 13 F.3d 711, 720-21 (3d Cir. 1994) (holding recorded conversations including racial epithet admissible because they "would have been virtually impossible to redact . . . without altering their substance"). The recording played for the jury was redacted at other points and was cut off entirely soon after the exchange involving the n-word, at the point when Cruzado invoked his 5th Amendment rights by stating that he didn't want to talk. (T5:57-58, T-MTS1:53.)

Given that the unredacted interrogation evidence lacked probative value and had an extremely high potential to cause unfair prejudice, the court's decision to admit the unredacted recording constituted an "unreasonable application of the . . . fair-trial principle" and did not comport with constitutional due process. *Coningford*, 640 F.3d at 485.

### D. Admitting the recording had a substantial and injurious effect or influence in determining on the jury's verdict

Cruzado is entitled to habeas relief because there is at least "grave doubt" that the admission of the unredacted recording had a "substantial and injurious effect or influence" on the jury's verdict. *Foxworth*, 570 F.3d at 436 (quoting *Brecht*, 507 U.S., at 633-34). The prejudice to Cruzado from the admission must be assessed in the context of the trial as a whole, as an error "that may seem insignificant where the evidence is overwhelming can assume a very different aspect in a close case." *See United States v. Hardy*, 37 F.3d 753, 759 (1st Cir. 1994) (improper comment by prosecutor deprived defendant of fair trial). Not only was the evidence here close, but there was no other evidence of a racial motive. Without the unredacted recording, race would not have entered the trial at all; with the recording, racial animus became the centerpiece of the Commonwealth's case.

The evidence against Cruzado apart from the recording was anything but overwhelming. Despite allegations that Cruzado had spent extensive time in Allen's apartment—Hernandez maintained that Cruzado drank alcohol and used drugs in one bedroom, showered, used the telephone, and presumably handled the belt and vase that caused

43

Allen's death—extensive investigation and testing yielded no forensic evidence that Cruzado had even been present in the dwelling, let alone fought with or killed Allen. (T6:27-28.) The Commonwealth gathered potential DNA evidence from a number of sources in the apartment, and the results of such testing consistently excluded Cruzado as a source of evidence. (T4:202.) The Commonwealth likewise tested Cruzado's pants for Allen's blood and found that the pants included only Cruzado's own blood. (T4:143, 196; T5:49-51.) A footprint on broken glass from the door was also analyzed and Cruzado was excluded as a match. (T6:28.)

Cruzado's own admission that he had encountered Hernandez on the street in Chelsea on November 24 was entirely compatible with—and indeed, supported—the defense theory that Hernandez fabricated Cruzado's involvement in order to deflect blame from himself. The police investigation initially focused on Hernandez, who after lying to police about his relationship to the victim deflected attention from himself by implicating Cruzado. (T5:105-06.) The police did not even credit this account enough to pursue it, until Hernandez returned and told them about the astonishing coincidence of Cruzado offering *two*

unsolicited confessions to the killing, once directly to Hernandez and once within his hearing. (T5:35; T3:141-42, 150-53.) The only external corroboration of Hernandez's self-interested allegations was the testimony from Matiaz and the calls placed to her from the victim's home on the day of the killing (although Matiaz was never asked about the content of those calls). (T3:269-73, T5:95-99.) With respect to both, the defense put forward a plausible alternative explanation that did not implicate Cruzado. (T6:38-40.)

The Commonwealth cannot meet its burden to establish the harmlessness of this error. "At the trial-court level, this case was close. In close cases, there is often a tipping point." *See Foxworth*, 570 F.3d at 436 (1st Cir. 2009) (admission of co-defendant's statement likely had substantial and injurious influence on the outcome). The Commonwealth viewed this evidence as important: it moved in limine to admit the exchange and the prosecutor referred to it in the climax of both her opening statement and closing argument. (T1:24, T2:76, T6:60.) Admitting the unredacted recording containing the word thus could have "tipped the balance." *See id*.; *Hawkins v. United States*, 358 U.S. 74, 80 (1958) (reversing conviction where erroneous admission of

45

spousal testimony could have "tip[ped] the scales against petitioner on the close and vital issue" of intent). Because there is at least "grave doubt" as to whether the admission had a "substantial and injurious effect or influence" on the jury's verdict, Cruzado is entitled to habeas relief. *Foxworth*, 570 F.3d at 436.

## Conclusion

For the foregoing reasons, Petitioner-Appellant Cruzado requests that this Court grant him the writ of habeas corpus.

Respectfully submitted,

/s/ Emma Quinn-Judge
Emma Quinn-Judge (1st Cir. #1138229)
Thomas Miller (1st Cir. #1207777)
Zalkind Duncan & Bernstein LLP
65a Atlantic Ave
Boston, MA 02110
(617) 742-6020
equinn-judge@zalkindlaw.com
tmiller@zalkindlaw.com

Date: May 22, 2023

## Certificate of Compliance

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,364 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ Emma Quinn-Judge
Attorney for Mario Cruzado
Dated: May 22, 2023

# Addendum Table of Contents

28 U.S.C § 2253 ........................................................................... 1

28 U.S.C § 2254 ........................................................................... 2

Rules Governing § 2254 Cases, Rule 11 .................................. 5

District Court Memorandum and Order Denying Petition ..................... 7

District Court Order of Dismissal ........................................... 19

District Court Order Granting Certificate of Appealability .................. 20

SJC Decision ............................................................................. 21

Interview Excerpt ...................................................................... 38

Transcript Vol. 1 Excerpt .......................................................... 42

Transcript Vol. 2 Excerpt .......................................................... 48

Transcript Vol. 6 Excerpt .......................................................... 50

# 28 U.S.C. § 2253. Appeal

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)

> (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>>
>> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

# 28 U.S.C. § 2254. State custody; remedies in Federal courts

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

(b)

    (1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

        (A) the applicant has exhausted the remedies available in the courts of the State; or

        (B)

            (i) there is an absence of available State corrective process; or

            (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

    (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

    (3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)

(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for

constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

(f) If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination. If the applicant, because of indigency or other reason is unable to produce such part of the record, then the State shall produce such part of the record and the Federal court shall direct the State to do so by order directed to an appropriate State official. If the State cannot provide such pertinent part of the record, then the court shall determine under the existing facts and circumstances what weight shall be given to the State court's factual determination.

(g) A copy of the official records of the State court, duly certified by the clerk of such court to be a true and correct copy of a finding, judicial opinion, or other reliable written indicia showing such a factual determination by the State court shall be admissible in the Federal court proceeding.

(h) Except as provided in section 408 of the Controlled Substances Act, in all proceedings brought under this section, and any subsequent proceedings on review, the court may appoint counsel for an applicant who is or becomes financially unable to afford counsel, except as provided by a rule promulgated by the Supreme Court pursuant to statutory authority. Appointment of counsel under this section shall be governed by section 3006A of title 18.

(i) The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.

12          RULES GOVERNING SECTION 2254 AND 2255 CASES

1    of appeals authorizing the district court to consider the

2    petition as required by 28 U.S.C. § 2244(b)(3) and (4).

**Rule 10.  Powers of a Magistrate Judge**

1          A magistrate judge may perform the duties of a

2    district judge under these rules, as authorized under 28

3    U.S.C. § 636.

**Rule 11.  Certificate of Appealability; Time to Appeal**

1          **(a) Certificate of Appealability.** The district court

2    must issue or deny a certificate of appealability when it

3    enters a final order adverse to the applicant. Before

4    entering the final order, the court may direct the parties to

5    submit arguments on whether a certificate should issue. If

6    the court issues a certificate, the court must state the

7    specific issue or issues that satisfy the showing required by

8    28 U.S.C. § 2253(c)(2). If the court denies a certificate, the

9    parties may not appeal the denial but may seek a certificate

10   from the court of appeals under Federal Rule of Appellate

RULES GOVERNING SECTION 2254 AND 2255 CASES        13

1    Procedure 22. A motion to reconsider a denial does not

2    extend the time to appeal.

3        **(b) Time to Appeal.** Federal Rule of Appellate

4    Procedure 4(a) governs the time to appeal an order entered

5    under these rules. A timely notice of appeal must be filed

6    even if the district court issues a certificate of appealability.

**Rule 12.   Applicability of the Federal Rules of Civil Procedure**

1        The Federal Rules of Civil Procedure, to the extent

2    that they are    not inconsistent with any statutory

3    provisions or these rules, may be applied to a proceeding

4    under these rules.

* * * * *

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MARIO CRUZADO, | ) |
| Petitioner, | ) |
| v. | ) Case No. 18-cv-12361-DJC |
| SUPERINTENDENT,<br>MCI-NORFOLK, | ) |
| Respondent. | ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **November 3, 2021**

## I.    Introduction

Petitioner Mario Cruzado ("Cruzado"), acting *pro se*, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition").  D. 1.  The Superintendent of MCI-Norfolk ("Respondent") opposes the Petition.  D. 14, 37.  For the reasons discussed below, the Court DENIES the Petition.

## II.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal courts may review petitions for habeas that have resulted in either a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  As an initial matter, a petitioner must show that he has exhausted all of his state court remedies or, in the alternative, that the State did not offer appropriate corrective measures.  Id.  To carry the burden of proving exhaustion, a petitioner must demonstrate that he has "fairly

1

Add.   7

and recognizably" presented his claim to the state's highest court, the Supreme Judicial Court in this case. Casella v. Clemons, 207 F.3d 18, 20 (1st Cir. 2000); Adelson v. DiPaola, 131 F.3d 259, 263 (1st Cir. 1997).

For the purposes of § 2254(d)(2), any factual determinations made by a state court are "presumed to be correct" unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

## III.    Relevant Factual and Procedural Background

Unless otherwise noted, the factual background set forth below is drawn from the Supreme Judicial Court's decision affirming Cruzado's conviction. Commonwealth v. Cruzado, 480 Mass. 275 (2018).

### A.    The Commission of the Crime

The charges against Cruzado arose out of events leading up to and culminating on November 26, 2010. Id. at 276. On November 24, 2010, the victim's boyfriend, Jamie Hernandez ("Hernandez"), unexpectedly encountered Cruzado, a former acquaintance of Hernandez. Id. Hernandez brought Cruzado to the victim's apartment in Chelsea, Massachusetts where the three drank together. Id. Later that morning, Hernandez brought Cruzado to a bus stop and then returned to the victim's apartment where Hernandez and the victim argued over the whereabouts of the victim's cell phone. Id. Hernandez left the apartment and did not return. Id. Two days later, the victim's body was found in the apartment. Id. The cause of death was strangulation and blunt force trauma to the head. Id.

2

### B.   Police Investigation and Charge

Eleven days later, Hernandez reported to police that Cruzado had made incriminating statements about the victim's death on two separate occasions.  Id.  Hernandez reported that on the first occasion, when he refused to give Cruzado a cigarette, Cruzado threatened to choke Hernandez as he had choked the victim.  Id.  Hernandez furthered that on the second occasion, he overheard Cruzado speaking on a cell phone using the word "belt" and "mentioned . . . ha[ving] his arm around somebody's neck."  Id.

Hernandez also directed investigators to a nearby apartment building where Cruzado was found asleep on a landing near a cell phone.  Id. at 281.  Investigators later questioned Cruzado about the cell phone at the police station.  Id.  Cruzado claimed that he had been given the cell phone to use the day before, but he did not know the owner's name or the telephone number.  Id.  Cruzado claimed the cell phone was not his and that the "dude" left it.  Id.  When the police asked whether Cruzado was supposed to return the cell phone to its owner Cruzado responded, "No."  Id.  In a recorded interview with police, officers asked Cruzado whether he knew the victim by either of his nicknames, to which Cruzado responded, "No."  Id. at 277.  The police then showed Cruzado a photograph of the victim, giving rise to the following exchange:

Q.: "I'm going to show you a picture of a guy. See if you've ever seen this guy before."

A.: "Who's that?"

Q.: "I'm asking you. Isn't this – I'm asking you. Have you ever seen this guy before? Yes or no?"

A.: "Who the fuck is that? Just a guy?"

Q.: "No, listen to me. Listen to me. Have you ever seen this guy before? Yes or

no?"

A.: "He looks like a nigger to me."

Q.: "Have you ever seen this guy before?"

A.: "He looks like a nigger to me."

Q.: "Have you ever seen this guy right here before?"

A.: "He looks like a nigger to me. No. He's black."

Q.: "No. It's a yes or no question."

A.: "He's black."

...

Q.: "Yes or no?"

A.: "Where the fuck I've ever seen him? I don't know that mother fucker."

Id.

Ten days after the police questioned Cruzado about the cell phone, police obtained a warrant to search the cell phone.  Id. at 281.  Information found on the cell phone led police to contact Cruzado's former girlfriend, Hilda Matiaz ("Matiaz").  Id.

Matiaz told investigators that Cruzado had called her, id. at 276, and told her that he visited an African American man's apartment in Chelsea, Massachusetts, id..  Cruzado recounted falling asleep after taking a shower at the apartment and awaking to the man touching Cruzado's testicles. Id.  Cruzado said he then fought the man, told him he was "not a fag[g]ot," and put him in a headlock.  Id.  He said the man then fell to the floor, after which Cruzado put on his clothes and left the apartment.  Id.  On June 24, 2011, Cruzado was indicted and charged with murder in

4

violation of Mass. Gen. L. c. 265 § 1 and receiving stolen property in violation of Mass. Gen. L. c. 250 § 60.[1]  D. 36 at 1.

**C.    Relevant State Court Proceedings**

Cruzado's trial began on December 11, 2012.  D. 36 at 1.  On December 18, 2012, the jury returned a guilty verdict of first-degree murder.  Id. at 2.  The trial court sentenced Cruzado to a term of life imprisonment.  Id.

In his timely appeal to the Supreme Judicial Court, Cruzado raised five claims:  (1) the trial court erroneously admitted certain portions of the recorded interview between Cruzado and police; (2) the trial court erroneously allowed Hernandez to testify about the argument he had with the victim; (3) Cruzado's trial counsel should have been allowed to question Matiaz about whether she was a drug dealer; (4) Cruzado's counsel was ineffective for failing to move to suppress information derived from the cell phone seized by police; and (5) the Commonwealth did not present physical evidence of the defendant's guilt.  Cruzado, 480 Mass. at 277.  The Supreme Judicial Court addressed each of these claims and affirmed the petitioner's first-degree murder conviction on August 10, 2018.  Id. at 285; D. 37 at 8.

**D.    This Petition**

In the Petition, Crichlow asserts the following grounds for habeas relief:  (1) that Cruzado's right to due process was violated when the trial court allowed, over Cruzado's objection, admission of portions of a recorded police interview in which Cruzado uses the N-word in reference to the victim (Ground One); and (2) Cruzado's trial counsel was ineffective for failing to file a motion

---

[1]The receipt of stolen property charge was dismissed on the Commonwealth's motion on December 19, 2012.  D. 36 at 2.

to suppress regarding the search and seizure of the cell phone (Ground Two).  D. 1 at 6, 8; D. 36 at 1.

IV.    **Discussion**

A.    **Admission of the Racial Epithet (Ground I)**

Cruzado contends that the Supreme Judicial Court's decision affirming the state court's admission of his recorded police interview, in which he used the N-word is contrary to clearly established federal law.  D. 36 at 10-11.

Cruzado argues that the admission of his use of the racial epithet at trial solely demonstrated bad character, which violated his due process rights.  D. 36 at 12.  He contends that the Supreme Judicial Court violated clearly established federal law by affirming the decision.  Id. at 11.  Evidentiary rulings that are so fundamentally unfair that they violate due process may serve as grounds for federal habeas corpus relief.  Coningford v. Rhode Island, 640 F.3d 478, 484 (1st Cir. 2011).  Habeas relief will only be triggered, however, if the state court's application of state law was "'so arbitrary or capricious as to constitute an independent due process . . . violation.'"  Id. (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)).  "[T]he category of infractions that violate 'fundamental fairness' [is defined] very narrowly."  Dowling v. U.S., 493 U.S. 342, 352 (1990).  Such application must violate fundamental conceptions of justice, going against "'the community's sense of fair play and decency.'"  Id. (quoting Rochin v. California, 342 U.S. 165, 173 (1952).

The Supreme Judicial Court reasonably determined that Cruzado did not meet this due process standard.  Although evidence showing bad character is generally inadmissible, United States v. Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996), such evidence may be admissible if it has a special probative value, id. (citing United States v. Aguilar-Montoya, 967 F.2d 708, 709 (1st Cir.

6

Add.  12

1992)); see Dickerson v. United States, 530 U.S. 428, 433-34 (2000).  Moreover, Cruzado does

not claim that any of the statements he made, including the use of the racial epithet, were made

involuntarily or obtained in a manner incompatible with the requirements of the Constitution.  See

United States v. Monroe, 264 F. Supp. 3d 376, 380, 387-88 (D.R.I. 2017).

The Supreme Judicial Court's determination that Cruzado's statements held a special

probative value was reasonable.  D. 1-2 at 8.  "[E]vidence of a defendant's prior bad acts may not

be admitted to prove his criminal character or propensity to commit crimes."  United States v.

Varoudakis, 233 F.3d 113, 118 (1st Cir. 2000).  "If the evidence brings unwanted baggage, say,

unfair prejudice or a cognizable risk of confusing the jury . . . the evidence must be excluded,"

United States v. Anguilar-Aranceta, 58 F.3d 796, 800 (1st Cir. 1995) (internal quotation marks and

citations omitted), although only if the "baggage's weight" substantially outweighs any probative

value.  Id.  When the evidence, however, is especially probative of an issue in the case, such as

intent or motive, it generally overcomes the prejudice bar and may be admitted.  See Frankhauser,

80 F.3d at 648.

Here, the racially charged language held substantial probative value in demonstrating

whether the crime may have been partially racially motivated.  Cruzado, 480 Mass. at 279.  It was

properly within the discretion of the trial court to allow this testimony when the Commonwealth's

theory of the case was that Cruzado could have been "enraged" not just that he was touched

sexually by the victim, a man, but an African-American man.  Id.  Moreover, "to mitigate the

prejudicial effect of the racial slur," the trial court conducted individual voir dire of the potential

jurors to front the likely admission of this evidence and address any potential bias.  Id. & n.1.

Moreover, Cruzado did not seek any limiting instruction regarding this evidence and a failure to

give one *sua sponte*, id. at 279, does not satisfy Cruzado's burden here. Accordingly, habeas relief for Ground I is not warranted here.

Cruzado additionally argues that when he used the racial epithet during the police interview, he denied knowing the victim, and therefore those portions of the recorded interview are inadmissible in court. D. 36 at 10. Under Massachusetts law, when a defendant is "'charged with a crime by an accusation made in his presence" and makes an equivocal reply "'susceptible of being interpreted as an admission . . . the question or statement and the answer or comment are admissible.'" Commonwealth v. Rogers, 8 Mass. App. Ct. 469, 473-74 (quoting Commonwealth v. McGrath, 351 Mass. 534, 538 (1967)). The accusatory statement will be admitted "to give meaning and effect" to the defendant's answer which is "admitted as an admission." Rogers, 8 Mass. App. Ct. at 474. A defendant's unequivocal denial of an accusation, however, is inadmissible. Id. at 475 (finding error where the court admitted a recording of police accusing the defendant of possessing a gun which the defendant unequivocally denied); see Commonwealth v. Spencer, 465 Mass. 32, 46-47, 51 (2013) (holding that the defendant's unequivocal denials of police questions that accused the defendant of lying or asked him to explain the reason why others thought he committed a crime were inadmissible).

Regarding Cruzado's interview, at no point during the interview in which Cruzado used the racial epithet did investigators accuse Cruzado of a crime or of engaging in any criminal activity. While it is true that "unequivocal denial[s] of an accusation . . .and the accusation it denies, are inadmissible" id. at 46, this rule applies to accusations of guilt. The investigators asked Cruzado whether he saw the victim before, to which Cruzado responded, "Who's that?" Cruzado, 480 Mass. at 277. Investigators continued to ask Cruzado whether he ever saw the victim before, until Cruzado responded, "He looks like a [N-word] to me. No. He's black." Id. The questions

8

posed by police were not accusations, therefore Cruzado responses could not be considered denials that would have been inadmissible under Massachusetts law.  State-law claims, however, are not a basis for federal habeas relief.  Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009).  This ground also fails because it is not contrary to clearly established federal law as discussed above.

     For all these reasons, the Petition on Ground I fails.

### B.     Ineffective Assistance of Counsel (Ground II)

Cruzado's second ground for habeas corpus relief is that his trial counsel was ineffective for failing to file a motion to suppress the seizure and search of the cell phone.  D. 36 at 13; D. 1-2 at 12.  To establish ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), Cruzado must show:  "(1) deficient performance by counsel (2) resulting in prejudice."  Yeboah-Sefah v. Ficco, 556 F.3d 53, 70 (1st Cir. 2009) (quoting Malone v. Clarke, 536 F.3d 54, 63 (1st Cir. 2008)).  To demonstrate deficient performance, Cruzado must illustrate that the counsel's performance "fell below an objective standard of reasonableness under the circumstances."  Ficco, 556 F.3d at 70 (quoting Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007)).  To demonstrate prejudice, Cruzado must show, "that, but for the counsel's unprofessional error, there is reasonable probability that the result of the proceeding would have been different."  Ficco, 556 F.3d 70 (quoting Sleeper, 510 F.3d at 39).

The legal standards created by Strickland and § 2254 are both highly deferential, . . . when the two apply in tandem, review is doubly so."[2]  Harrington v. Ritcher, 562 U.S. at 105 (citations and quotation marks omitted).  "The Strickland standard [itself] is a general one, so the range of reasonable applications is substantial."  Id.  When habeas applies, the question is not whether

---

[2]Massachusetts's ineffective assistance of counsel standard does not employ "identical phraseology" as the Strickland standard, but the two are "functional[ly] equivalent" for habeas purposes.  See Ouber v. Guarino, 293 F.3d 19, 32 (1st Cir. 2002).

counsel's actions were reasonable, but rather whether there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Id.</u>  In other words, the pivotal question here is whether the Supreme Judicial Court's application was reasonable.  <u>See Mello v. DiPaulo</u>, 295 F.3d 137, 143 (1st Cir. 2002); <u>Harrington</u>, 562 U.S. at 105.

Regarding the first <u>Strickland</u> requirement, deficiency will only be found where "counsel's choice was so patently unreasonable that no competent attorney would have made it." <u>Williams v. United States</u>, 858 F.3d 708, 715 (1st Cir. 2017) (internal quotation marks omitted) (quoting <u>Knight v. Spencer</u>, 447 F.3d 6, 15 (1st Cir. 2006)).  Regarding the prejudice requirement, relief will only be granted if Cruzado has demonstrated that there is a reasonable probability that the result of the proceeding would have been different if not for counsel's error.  <u>Strickland</u>, 466 U.S. at 694.  Even if counsel made a professionally unreasonable error, however, the judgment of a criminal proceeding will not be set aside if that error has no effect on the judgment.  <u>Id.</u>

Here Cruzado contends that his trial counsel was ineffective in failing to move to suppress the search and seizure of the cell phone police found located near Cruzado.  D. 36 at 13.  Cruzado argues that if his trial counsel had filed a motion to suppress on these grounds, the motion would have been successful.  <u>Id.</u>  As to this claim, the Supreme Judicial Court concluded that the motion to suppress would have been unsuccessful because police had probable cause to seize and search the cell phone (including that the Cruzado and the victim had been together on the day of the murder and that Hernandez had recently overhead Cruzado make inculpatory statements to an unidentified person on a cell phone), but also because there were "exigent circumstances" for the warrantless seizure including "the risk of someone taking or tampering with the cell phone" and that if "[l]eft unattended, especially in an area to which many people had access [i.e., stairwell of an apartment building], the cell phone would have been at risk of 'theft or vandalism.'" <u>Cruzado,</u>

480 Mass at 282-83.  It cannot be said that Cruzado's attorney was ineffective for failing to bring a futile motion.  <u>Vieux v. Pepe</u>, 184 F.3d 59, 64 (1st Cir. 1999); <u>DeLong v. Brady</u>, 723 F. Supp. 2d 376, 393 (D. Mass. 2010).

For similar reasons, Cruzado has failed to satisfy the prejudice prong of the <u>Strickland</u> test. For this prong, a petitioner must show "that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Turner v. United </u>States, 699 F.3d 578, 584 (1st Cir. 2012) <u>and cases cited</u>.  Given the reasons that a motion to suppress, if one had been filed by counsel, would have futile given the facts and circumstances here, this Court also concludes that Cruzado has failed to show that "but for" for counsel's failure to file such motion, the outcome of his trial would have been different.  <u>Smith</u>, 528 U.S. at 285-86.  Accordingly, the Petition fails on Ground II as well.

## V.    <u>Conclusion and Certificate of Appealability</u>

For the foregoing reasons, the Court DENIES the Petition, D.1.  Cruzado may receive a certificate of appealability only if he "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  A certificate of appealability is appropriate when "reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong."  <u>Miller–El</u>, 537 U.S. at 338 (internal quotations omitted).  Based upon the analysis of the record and the applicable law in this Memorandum and Order, the Court does not, at this juncture, conclude that reasonable jurists would find its conclusion debatable or wrong.  The Court, therefore, is not inclined to issue a certificate of appealability, but will give Cruzado until December 3, 2021 to file a memorandum, if he seeks to address the issue of whether a certificate of appealability is warranted as to either or both grounds in the Petition.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

**MARIO CRUZADO**

**V.**                                    **CIVIL ACTION NO. 18-12361-DJC**

**SUPERINTENDENT MCI
NORFOLK**

## ORDER OF DISMISSAL

CASPER, D.J.

In accordance with the Memorandum and Order dated November 3, 2021 denying the

habeas petition, D.1, the above-entitled action be and hereby is DISMISSED.

November 3, 2021                          /s/ Lisa M. Hourihan
                                          Deputy Clerk

Judge Denise J. Casper: ELECTRONIC ORDER entered. D. 42: Having considered the Petitioner's further filing seeking a certificate of appealability as to Ground One in the habeas petition, the Court GRANTS a certificate of appealability but only as to Ground One in the Petition.(Hourihan, Lisa) (Entered: 01/04/2022)

NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11670

COMMONWEALTH  vs.  MARIO CRUZADO.

Suffolk.    May 11, 2018. - August 10, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Budd, & Cypher, JJ.

Homicide.  Evidence, Videotape, Admissions and confessions,
     Inflammatory evidence, Motive, Hearsay, Cross-examination.
     Practice, Criminal, Capital case, Admissions and
     confessions, Hearsay, Assistance of counsel.
     Constitutional Law, Assistance of counsel, Search and
     seizure, Probable cause.  Search and Seizure, Probable
     cause, Exigent circumstances.


     Indictment found and returned in the Superior Court
Department on June 24, 2011.

     The case was tried before Linda E. Giles, J., and a motion
for a new trial, filed on July 1, 2016, was considered by her.


     Ruth Greenberg for the defendant.
     Colby M. Tilley, Assistant District Attorney, for the
Commonwealth.


     BUDD, J.  On November 26, 2010, the day after Thanksgiving,

Frederick Allen, III, was found dead in his home.  The

defendant, Mario Cruzado, was convicted of murder in the first

degree in connection with the killing.  In this consolidated
appeal from the judgment of conviction and from the denial of
his motion for a new trial, the defendant argues that errors
committed by his counsel and by the judge require a reversal of
his conviction.  Upon review, we affirm and decline to reduce or
set aside his conviction under G. L. c. 278, § 33E.

Background.  We summarize the facts the jury could have
found, reserving certain details for discussions of the issues.

On the day before Thanksgiving in 2010, the victim's boy
friend, Jaime Hernandez, encountered the defendant, a former
acquaintance, and brought him to the victim's apartment in
Chelsea.  The three spent time drinking; later that morning,
Hernandez left the defendant at a bus stop.  When Hernandez
returned to the victim's apartment, he argued with the victim
over the whereabouts of the victim's cellular telephone (cell
phone).  As a result, Hernandez left the apartment and did not
return.  Two days later, the victim's body was discovered.  An
autopsy revealed that the cause of death was strangulation and
blunt force trauma to his head.

Eleven days later, Hernandez reported to police that he had
twice encountered the defendant, and that each time the
defendant had made incriminating statements about the victim's
death.  During the first encounter, Hernandez reported that when
Hernandez refused to give the defendant a cigarette, the

defendant threatened to choke Hernandez like he had choked the victim.  The second incident occurred the next day, when Hernandez overheard the defendant, who was in an apartment building speaking on a cell phone.  In a blend of Spanish and English, the defendant used the word "belt" and "mentioned . . . ha[ving] his arm around somebody's neck."

Hilda Matiaz, the defendant's former girl friend, told investigators that the defendant telephoned her and told her the following.  The defendant visited an African-American man's apartment in Chelsea.  The defendant showered, fell asleep, and woke to the man touching the defendant's testicles.  The defendant fought the man and said he was "not a fag[g]ot."  The defendant put the man in a headlock, and the man fell to the floor.  The defendant then put on his clothes and left the apartment.

Discussion.  The defendant contends that several errors require reversal.  First, he challenges the trial judge's admission of portions of a video recording of an interview between police and the defendant.  Second, he claims it was error for the judge to allow Hernandez to testify regarding the argument that Hernandez had with the victim.  Third, he contends that he was improperly precluded from questioning Matiaz about whether she was a drug dealer.  Fourth, he appeals from the denial of his motion for a new trial on the ground that his

counsel was constitutionally ineffective for failing to file a
motion to suppress.  Finally, he asks this court to reverse his
conviction or reduce his verdict pursuant to G. L. c. 278,
§ 33E, on the ground that the Commonwealth presented no physical
evidence of his guilt.  We address each claim in turn.

    1.  <u>Defendant's recorded police interview</u>.  The defendant
argues that portions of a recorded police interview were
admitted in error.  In portions of the video recording played
for the jury, State police troopers asked the defendant whether
he knew the victim.  When asked whether the defendant knew the
victim by either of his nicknames, the defendant responded,
"No."  Later, after the police showed a photograph of the victim
to the defendant, the defendant and the troopers had the
following exchange:

> <u>Q</u>.:  "I'm going to show you a picture of a guy.  See if
> you've ever seen this guy before."
>
> <u>A</u>.:  "Who's that?"
>
> <u>Q</u>.:  "I'm asking you.  Isn't this -- I'm asking you.  Have
> you ever seen this guy before?  Yes or no?"
>
> <u>A</u>.:  "Who the fuck is that?  Just a guy?"
>
> <u>Q</u>.:  "No, listen to me.  Listen to me.  Have you ever seen
> this guy before?  Yes or no?"
>
> <u>A</u>.:  "He looks like a nigger to me."
>
> <u>Q</u>.:  "Have you ever seen this guy before?"
>
> <u>A</u>.:  "He looks like a nigger to me."

Q̲.: "Have you ever seen this guy right here before?"

A̲.: "He looks like a nigger to me.  No.  He's black."

Q̲.: "No.  It's a yes or no question."

A̲.: "He's black."

. . .

Q̲.: "Yes or no?"

A̲.: "Where the fuck I've ever seen him?  I don't know that mother fucker."

Although an opposing party's statements are generally admissible against him or her, see Commonwealth v. Spencer, 465 Mass. 32, 46 (2013); Mass. G. Evid. § 801(d)(2)(A) (2018), the defendant contends that admission of these portions of the videotaped interview was error.  We disagree.

a.  Defendant's denials.  "It is well established . . . that if the extrajudicial statement by a criminal defendant is an unequivocal denial of an accusation, it, and the accusation it denies, are inadmissible." Spencer, 465 Mass. at 46.  The defendant argues that, for this reason, portions of the video recording in which he denied knowing the victim were inadmissible.

However, the questions regarding the defendant's familiarity with the victim were not accusations of guilt; that is, the question whether the defendant knew the victim was not directly tied to the defendant's culpability.  Compare

Commonwealth v. Womack, 457 Mass. 268, 272 (2010) (defendant's responses to assertions that defendant committed crime improperly admitted at trial). Because the questions investigators posed regarding whether he recognized or knew the victim did not accuse him of criminal activity, the defendant's statements denying that he knew the victim were properly admitted.

b. Evidence of racial animus. The defendant also challenges the admission of portions of the interview in which he refers to the victim as "a nigger," arguing that the reference was irrelevant and unduly prejudicial. Again, we discern no error.

Although the prosecution is not permitted to introduce evidence of a defendant's bad character to show his or her "propensity to commit the crime charged, . . . such evidence may be admissible if relevant for some other purpose," including motive. Commonwealth v. Howard, 469 Mass. 721, 738 (2014), quoting Commonwealth v. Helfant, 398 Mass. 214, 224 (1986).

The defendant was accused of killing a gay African-American man. The Commonwealth offered the evidence to show the defendant's animus toward African-Americans, and thus as a partial motive for the killing. See Commonwealth v. Bishop, 461 Mass. 586, 596-597 (2012) (statement suggesting racial animus properly admitted to show motive). See also Commonwealth v.

Carlson, 448 Mass. 501, 508-509 (2007) (although motive is not essential element of murder in first degree, evidence of motive may be relevant to malice or intent).  Concluding that "the Commonwealth is entitled to elicit the fact that [the defendant] could have been enraged, not just because he was allegedly touched by this gay man, but he was allegedly touched by an African-American man," the judge did not abuse her discretion in determining that the probative value of the evidence outweighed its prejudicial effect.  See Spencer, 465 Mass. at 52 (weighing of prejudice and probative value left to discretion of trial judge).

To mitigate the prejudicial effect of the racial slur, moreover, the judge conducted an individual voir dire of potential jurors to eliminate potential bias.[1]  See Commonwealth v. Alleyne, 474 Mass. 771, 780 (2016) (discussing use of voir dire to mitigate prejudice); Commonwealth v. De La Cruz, 405 Mass. 269, 274 (1989) ("when requested, we encourage individual voir dire as to possible juror prejudice based on ethnic considerations").  Although the judge did not provide a limiting instruction, the defendant did not request one.  "[T]here is no

---

[1] The judge inquired of each prospective juror:  "The defendant is Hispanic; the alleged victim was African-American.  You'll also hear evidence that the defendant allegedly referred to the alleged victim as a nigger.  Do you have any feelings, based on race, that might affect your ability to be fair and impartial?"

requirement that the judge give limiting instructions sua sponte." Commonwealth v. Sullivan, 436 Mass. 799, 809 (2002). "Nor does the lack of a limiting instruction necessarily create a substantial likelihood of a miscarriage of justice." Id. See Bishop, 461 Mass. at 596-597 (no abuse of discretion despite lack of limiting instruction on use of word "nigger").[2,3]

2. Admission of argument between Hernandez and victim. The Commonwealth elicited testimony from Hernandez regarding an argument Hernandez had with the victim over the whereabouts of the victim's cell phone after the defendant left. Hernandez testified that when he denied having stolen the cell phone, the victim concluded that the defendant had stolen it. Hernandez further testified that, after the argument, Hernandez left the victim's apartment and did not return. The defendant claimed at trial, and again on appeal, that the testimony, which supported Hernandez's alibi, was hearsay. We disagree.

An out-of-court statement not offered for its truth is not hearsay. See Commonwealth v. Jenkins, 458 Mass. 791, 793

---

[2] The defendant's argument that the admission of the word "nigger" as evidence of racial animus violated his due process rights is unavailing, as the word came from his own mouth several times.

[3] Because the evidence was properly admitted, it was also proper for the prosecutor to comment on it in closing argument. Prosecutors may argue "based on the evidence and on inferences that may reasonably be drawn from the evidence." Commonwealth v. Kozec, 399 Mass. 514, 516 (1987).

(2011); Commonwealth v. Silanskas, 433 Mass. 678, 693 (2001).

Hernandez's testimony about the argument was not offered to

prove that the defendant stole the victim's cell phone but,

rather, to show that Hernandez and the victim argued, that

Hernandez subsequently left, and why he did not return.  See

Commonwealth v. Perkins, 450 Mass. 834, 844 (2008).  See also

Commonwealth v. Keown, 478 Mass. 232, 246 (2017), cert. denied,

138 S. Ct. 1038 (2018); Commonwealth v. Brown, 474 Mass. 576,

587 (2016).  To ensure that the jury did not use Hernandez's

statements to prove the truth of what they asserted, the judge

instructed the jury on the matter.  See Commonwealth v. Santana,

477 Mass. 610, 622 (2017).  She told the jury that the

Commonwealth was not alleging that the defendant stole the cell

phone in question, and that they should not consider it for that

purpose.  There was no error.  See id.

3.  Matiaz's cross-examination.  Although the defendant

claimed that he did not know the victim and that he had never

been to the victim's home, the Commonwealth presented evidence

that, on November 24, 2010, five calls were made from the

victim's landline telephone to Matiaz, who was known to the

defendant but not to the victim.[4]  In an attempt to advance the

---

[4] The telephone calls were made between 5:57 P.M. and 6:44
P.M., providing strong circumstantial evidence that the
defendant returned to the victim's apartment on the evening of
the victim's death, after Hernandez had left for the last time.

theory that it was in fact the victim who called Matiaz because he was seeking illegal drugs, defense counsel sought to question Matiaz regarding whether she was a drug dealer. The trial judge disallowed that line of questioning. The defendant claims on appeal that he was improperly precluded from advancing a viable defense. The judge did not err.

A defendant has a right to cross-examine witnesses who testify against him or her, but that right has limits. Commonwealth v. Johnson, 431 Mass. 535, 540 (2000). Those limits include the requirement that the questions have a legitimate basis in evidence. Id. See Mass. R. Prof. C. 3.4 (e) (1), as appearing in 471 Mass. 1425 (2015) ("A lawyer shall not . . . state or allude to any matter that the lawyer does not reasonably believe . . . will not be supported by admissible evidence . . ."). Accord Commonwealth v. Hart, 455 Mass. 230, 240 (2009). The judge did not abuse her discretion by disallowing any reference to the defense's theory that Matiaz was a drug dealer on the grounds that it was speculative and without evidentiary support. The defendant made no proffer that there was any relationship between Matiaz and the victim. Further, the only support for the defense theory that Matiaz was a cocaine dealer was that she had been arrested for possessing heroin three years prior to the killing. There is no logical connection between a 2007 arrest for possession of heroin and

the defense theory that, years later, Matiaz was known to the
victim as a cocaine dealer.  There was no error.[5]

4.  <u>Ineffective assistance of counsel</u>.  Thirteen days after
the killing, Hernandez informed police of incriminating
statements that the defendant made while speaking to a person
later identified as Matiaz.  Hernandez directed police to a
nearby apartment building, where they found the defendant asleep
on a landing; a cell phone was on the floor approximately one
foot away from him.  During questioning at the station, the
defendant claimed that a "crack head" had given the cell phone
to him to use a day prior, but that he did not know the owner's
name or the telephone number.  When confronted with the cell
phone, although he twice claimed it was not his, he also said
that the "dude" left it, responding "no" when police asked
whether the defendant was supposed to return the cell phone.
Ten days later, police sought and received a warrant to search
the cell phone, which led police to contact Matiaz.

The defendant now claims that his trial counsel was
ineffective for failing to move to suppress the cell phone and

---

[5] The defendant's related claim that it was a violation of
due process for the prosecutor to exploit the absence of
evidence that was excluded at her request is also unavailing.
The line of questioning prohibited was that Matiaz was a drug
dealer.  The prosecutor argued only that Matiaz knew neither the
victim nor Hernandez; she did not address the question whether
Matiaz was a drug dealer.  The argument was proper.

its contents.[6]  In cases of murder in the first degree, in order
to prevail on a claim of ineffective assistance of counsel due
to a failure to move to suppress evidence, the defendant must
demonstrate both that the motion would have been successful and
that counsel's failure to make the motion created a substantial
likelihood of a miscarriage of justice.  Commonwealth v.
Williams, 453 Mass. 203, 207 (2009), citing Commonwealth v.
Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).
The defendant contends that police seized the cell phone without
probable cause and waited an unreasonable amount of time before
applying for and obtaining a warrant to search its contents, and
that thus a motion to suppress would have been successful.  We
disagree.

First, we note that, although the cell phone did not belong
to the defendant, he had a possessory interest in it; thus, he
would have had standing to contest its seizure.[7]  See
Commonwealth v. Fulgiam, 477 Mass. 20, 35-36, cert. denied, 138
S. Ct. 330 (2017) (possessory interest established standing to

---

[6] The defendant unsuccessfully made the same claim in a
motion for a new trial.

[7] The defendant claims, incorrectly, that the charges
against him grant him automatic standing.  Our case law provides
for automatic standing from criminal charges where possession of
the thing seized is an essential element of the crime charged.
Commonwealth v. Montanez, 410 Mass. 290, 301 (1991).  Possession
is not an element of murder in the first degree.  See
Commonwealth v. Lodge, 431 Mass. 461, 474 (2000).

challenge search of cell phone even though defendant did not own cell phone searched). Indeed, a critical part of the Commonwealth's theory of the case was that the cell phone was the defendant's. See id. at 36. However, although the defendant had standing to challenge the seizure of the cell phone, any such challenge would have failed, as police had probable cause to seize the cell phone and exigent circumstances existed to do so without a warrant. See Commonwealth v. White, 475 Mass. 583, 588 (2016).

When the police encountered the defendant sleeping in the stairwell with the cell phone on the floor near his head, they had information that the defendant and victim had been together on the day of the murder, and also that Hernandez had recently overheard the defendant confessing to the murder to an unidentified person on a cell phone. This provided ample probable cause to believe that the cell phone located near the defendant would contain evidence of the crime. See Commonwealth v. Kaupp, 453 Mass. 102, 105-106 (2009).

Further, exigent circumstances supported the warrantless seizure: the risk of someone taking or tampering with the cell phone. Left unattended, especially in an area to which many people had access, the cell phone would have been at risk of "theft or vandalism." See Commonwealth v. Daley, 423 Mass. 747, 750 (1996) (discussing impoundment of vehicles). "With probable

cause, the police may seize property 'to prevent destruction or removal of evidence'" before obtaining a search warrant. Commonwealth v. Gentile, 437 Mass. 569, 573 (2002), quoting Commonwealth v. Taylor, 426 Mass. 189, 195 (1997).  See Riley v. California, 134 S. Ct. 2473, 2486 (2014) (discussing risk of data being deleted from cell phone); Kaupp, 453 Mass. at 106.

Given the defendant's possessory interest in the cell phone, we next consider the reasonableness of the ten-day delay from the police's seizure of the cell phone to their application for a warrant to search it.[8]

Although police are permitted to hold a seized item for "the relatively short period of time needed . . . to obtain a search warrant," they must "release the item if a warrant is not obtained within that period."  White, 475 Mass. at 593, quoting Gentile, 437 Mass. at 573.  We have said that there is no bright-line rule that demarcates when a delay is unreasonable. White, supra.  Instead, we analyze each case by its own facts, "balanc[ing] the nature and quality of the intrusion on the individual's [interests under the Fourth Amendment to the United States Constitution] against the importance of the government interests alleged to justify the intrusion."  Id. at 593-594, quoting United States v. Place, 462 U.S. 696, 703 (1983).

---

[8] Contrary to the Commonwealth's argument, it is not at all clear that the defendant intended to abandon the cell phone at the police station.

Here, the defendant's minimal possessory interest was far outweighed by the government's interest in obtaining evidence regarding a recent murder.[9]  Although the defendant claimed to be using the cell phone, he admitted that he had only had it for a day.  Moreover, he was unaware of the identity of its actual owner, or even of its number, and he repeatedly told police that the cell phone was not his.  Critically, police likely would not have been able to return the cell phone to the defendant even if he had requested it:  they would not have been able to ascertain that the cell phone belonged to the defendant, as he stated that he had received it from a male "crack head" and the cell phone had the name "Vanessa" displayed on it.[10]  Whatever possessory interest the defendant had in the cell phone was thus extremely weak, in contrast to that in White, upon which the defendant primarily relies.  In that case, the defendant was the actual owner of the cell phone seized.  White, 475 Mass. at 595 n.15.

---

[9] We have said that whether police acted diligently in applying for the warrant is a factor that may be relevant.  See Commonwealth v. White, 475 Mass. 583, 594 (2016).  However, we have never said that it is a dispositive factor.  Here, the record is silent as to police work on applying for the warrant in the ten days in question.

[10] The cell phone was later determined to belong to a woman named "Vanessa," who had lost it.  Indeed, the Commonwealth initially charged the defendant with receiving stolen property, dismissing the charge only when the defendant stipulated that the cell phone belonged to someone else.

The Commonwealth's interest in the cell phone, by contrast, was strong:  police had probable cause to believe that evidence critical to a recent murder was present on the cell phone, as discussed <u>supra</u>.  There can be no doubt that there is a "strong government interest in solving crimes and bringing offenders to justice."  <u>United States</u> v. <u>Hensley</u>, 469 U.S. 221, 229 (1985).  This interest is particularly strong "in the context of felonies or crimes involving a threat to public safety," such as murder.  <u>Id</u>.  Judged against the defendant's minimal possessory interest, the governmental interests justified a ten-day delay.  See <u>Kaupp</u>, 453 Mass. at 106-107 (nine-day delay reasonable in investigation of child pornography).  A motion to suppress the cell phone and its contents would have been unavailing; thus, the defendant's ineffective assistance claim fails.

5.  <u>Review under G. L. c. 278, § 33E</u>.  The defendant asks us to exercise our extraordinary power to set aside or reduce his verdict under G. L. c. 278, § 33E.[11]  His main argument is that it is "close to impossible" for the defendant to have spent so much time in the victim's apartment and yet "left not one

---

[11] In response to a request by this court, the parties provided further briefing on the question whether defense counsel was ineffective for failing to request an instruction on provocation.  In <u>Commonwealth</u> v. <u>Pierce</u>, 419 Mass. 28 (1994), we rejected a provocation instruction on facts nearly indistinguishable from these.  Although the victim touching the defendant's testicles was offensive, "it was not the type of behavior that would provoke a reasonable person into a homicidal response."  <u>Id</u>. at 32.

trace."  This is not a compelling reason to grant relief under
§ 33E.  Defense counsel vigorously cross-examined witnesses
regarding the lack of physical evidence, and focused on it in
closing argument.  The Commonwealth, by contrast, presented
testimonial and documentary evidence that, although
circumstantial, was found to be sufficient to convict the
defendant.  See Commonwealth v. Gonzalez, 475 Mass. 396, 407
(2016) (circumstantial evidence alone may be sufficient to
convict).  "We do not sit as a second jury to pass anew on the
question of the defendant's guilt." Commonwealth v. Watkins,
373 Mass. 849, 853 (1977).  See Commonwealth v. Wood, 469 Mass.
266, 269 (2014) (declining to grant relief under G. L. c. 278,
§ 33E, despite "lack of forensic evidence tying either
[defendant] to the crime scene"); Commonwealth v. Williams, 450
Mass. 645, 656 (2008) ("The lack of forensic evidence . . . was
argued to the jury . . . and was for them to consider").

Judgment affirmed.

Order denying motion for a
new trial affirmed.

# ORIGINAL

Volume:  I
Pages:   67

## COMMONWEALTH OF MASSACHUSETTS

Suffolk County, ss.                    SUFFOLK SUPERIOR COURT
                                       SUCR2011-10628

COMMONWEALTH

v.

MARIO CRUZADO

CRIMINAL

Interview of Mario Cruzado

December 7, 2010

------------------------

APPEARANCES:

------------------------

Trooper Thomas Keene
Detective Myles
(Interviewers)

Mario Cruzado
(Interviewee)

CAMBRIDGE TRANSCRIPTIONS
675 Massachusetts Avenue
Cambridge, MA   02139
(617) 547 - 5690
www.ctran.com

C.A. 147

Commonwealth v. Cruzado                                          52
Witness Interview: Mario Cruzado

1           TROOPER KEENE:  Okay.  And then you took a train?

2           MR. CRUZADO:  No.  I took the yellow.

3           TROOPER KEENE:  Yellow what?

4           MR. CRUZADO:  The train.

5           TROOPER KEENE:  The yellow train?

6           MR. CRUZADO:  Of course.  You trying to fuck with

7       me.

8           TROOPER KEENE:  No.  (Indiscernible).

9           MR. CRUZADO:  Listen.

10          TROOPER KEENE:  You're trying to fuck with us.

11          MR. CRUZADO:  I came -- as long as I took a bus

12      it cost $1.50.

13          TROOPER KEENE:  Right.

14          MR. CRUZADO:  It cost $1.50.  And the train cost

15      $2 I think.  Jesus.

16          Can I (indiscernible)?

17          DETECTIVE MYLES:  Yeah.  You have to do that in

18      court.

19          TROOPER KEENE:  Okay.  I'm going to show you a

20      picture of a guy.  See if you've ever seen this guy before.

21          MR. CRUZADO:  Who's that?

22          TROOPER KEENE:  I'm asking you.  Isn't this --

23      I'm asking you.  Have you ever seen this guy before?  Yes

24      or no?

25          MR. CRUZADO:  Who the fuck is that?  Just a guy?

CAMBRIDGE TRANSCRIPTIONS        C.A. 198             DECEMBER 7, 2010

Commonwealth v. Cruzado
Witness Interview: Mario Cruzado                                    53

1              TROOPER KEENE:  No.  Listen to me.  Listen to me.
2      Have you ever seen this guy before?  Yes or no?
3              MR. CRUZADO:  He looks like a nigger to me.
4              TROOPER KEENE:  Have you ever seen this guy
5      before?
6              MR. CRUZADO:  He looks like a nigger to me.
7              TROOPER KEENE:  Have you ever seen this guy right
8      here before?
9              MR. CRUZADO:  He looks like a nigger to me.  No.
10     He's black.
11             TROOPER KEENE:  No.  It's a yes or no question.
12             MR. CRUZADO:  He's black.
13             TROOPER KEENE:  I understand.
14             DETECTIVE MYLES:  Have you ever seen him?
15             TROOPER KEENE:  Yes or no?
16             MR. CRUZADO:  Where the fuck I've ever seen him?
17     I don't know that mother fucker.
18             DETECTIVE MYLES:  So you've --
19             TROOPER KEENE:  Well, that's what I'm asking.
20             DETECTIVE MYLES:  --never seen him before?
21             MR. CRUZADO:  No.  I never seen him --
22             TROOPER KEENE:  Okay.  That's --
23             MR. CRUZADO:  -- in my life.
24             TROOPER KEENE:  See, what I don't understand is
25     why you make the questions so difficult.

Commonwealth v. Cruzado
Witness Interview: Mario Cruzado                              54

```
 1            MR. CRUZADO:  Because you're --
 2            TROOPER KEENE:  I'm not making --
 3            DETECTIVE MYLES:  Listen to me.  Listen.
 4            TROOPER KEENE:  Calm down.  I'm not making things
 5     different.  I asked you --
 6            MR. CRUZADO:  I'm here for a warrant --
 7            TROOPER KEENE:  -- yes or no.
 8            MR. CRUZADO:  -- and you mother fuckers asking me
 9     a mother fucking murder?  Who?  Who the fuck is him?
10            TROOPER KEENE:  I didn't say he was murdered.
11            MR. CRUZADO:  You know what I mean?  Who the fuck
12     is he?  You asking me --
13            TROOPER KEENE:  I said --
14       ⁞   MR. CRUZADO:  -- (indiscernible).
15            TROOPER KEENE:  Listen to me.
16            MR. CRUZADO:  You said -- You're saying that
17     you're -- you're investigating a murder.  Who the fuck is
18     him?  I don't know him.
19            TROOPER KEENE:  I never told you who he was.
20            MR. CRUZADO:  I don't know who the fuck --
21            TROOPER KEENE:  I never said who he is.
22            MR. CRUZADO:  -- is.  And I'm just saying that --
23            TROOPER KEENE:  I'm just asking if you --
24            MR. CRUZADO:  -- you're --
25            TROOPER KEENE:  -- know this guy.
```

S.A.3530
Add. 41

```
                                        VOLUME:    I
                                        PAGES:     1-303
                                        EXHIBITS:  NONE
```

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS                    SUPERIOR COURT DEPARTMENT
                              OF THE TRIAL COURT
                              DOCKET NO.: SUCR2011-10628

```
* * * * * * * * * * * * * * * * *
                                *
COMMONWEALTH OF MASSACHUSETTS   *
                                *
vs.                             *
                                *
MARIO CRUZADO                   *
                                *
* * * * * * * * * * * * * * * * *
```

TRIAL (BEFORE A JURY)
BEFORE THE HONORABLE LINDA GILES

APPEARANCES:

For the Commonwealth:
Suffolk County District Attorney's Office
One Bulfinch Place
Boston, Massachusetts 02114-2997
By: Holly Broadbent, Assistant District Attorney

For the Defendant Cruzado:
Feinberg & Kamholtz
One South Market Building, 4th Floor
Faneuil Hall Marketplace
Boston, Massachusetts 02109
By: Matthew Feinberg, Esq.
By: Matthew Kamholtz, Esq.

```
                              Boston, Massachusetts
                              Room 806
                              December 11, 2012
```

CAROLYN SPROUL, COURT REPORTER
SUFFOLK SUPERIOR COURT
BOSTON, MASSACHUSETTS
617-285-3725

1-24

1    and we can deal with all the other Motions in Limine

2    after impanelment, because I don't want to lose the

3    jury pool.

4         The issue of the N-word.  There is a

5    defendant's Motion in Limine regarding the

6    defendant's use of the word nigger, and I believe

7    there is a corresponding motion from the

8    Commonwealth, if I'm not mistaken.

9         MS. BROADBENT:  There is.  Commonwealth's

10   Motion in Limine to admit the defendant's unredacted

11   statements.

12        THE COURT:  That's it.  All right.  And that

13   pertains, again, to the word nigger?

14        MS. BROADBENT:  Correct.

15        THE COURT:  So I understand, Ms. Broadbent,

16   it's the Commonwealth's theory that Mr. Cruzado's use

17   of the word nigger shows his anti-African-American

18   bias?

19        MS. BROADBENT:  Correct.

20        THE COURT:  And that would be part of his

21   motive.

22        MS. BROADBENT:  Correct.  Specifically when

23   they ask -- when they get to the point in the 36-

24   minute or so interview with the defendant about

25   whether or not he knew the victim in this case.  They

1    start by asking him "Have you ever been to this

2    address?  Did you ever go into this residence with

3    Mr. Hernandez?" -- the other witness that we've

4    referred to -- "No.  No.  No."

5         They finally show him a picture, "Do you

6    know this man?  Have you ever met this man before?"

7    and then the N-word comes into play, "He looks like

8    an N to me.  He looks like an N to me.  No.  I don't

9    know, he's black."  I mean it's clear that there is

10   animosity shown as soon as he sees that this is a

11   picture of an African-American man, a black man, that

12   he's using that language.

13        It's the Commonwealth's, really, overall

14   theory of the case that the defendant, before the day

15   of the homicide, had never met the victim, that when

16   he's at the house there is some type of argument that

17   occurs between the defendant and the victim.  There

18   will be testimony from another witness that the

19   defendant told this witness that the victim was

20   touching him inappropriately, and he responded by

21   putting this man in a choke hold and tells the

22   witness, "I'm no fag.  I'm no fag.  I won't be

23   touched that way."  Those are generally his words.

24        So it's the Commonwealth's theory that this

25   man was a gay man, was a black man, who may have made

1-26

```
 1    a sexual advance toward the defendant, along with a
 2    fight over a cell phone is what precipitated the
 3    homicide.  And it's absolutely relevant.  It's not a
 4    word that the troopers introduced into the interview;
 5    it's a word that he introduced and they should hear
 6    it to show his animosity.
 7              THE COURT:  Mr. Feinberg?
 8              MR. FEINBERG:  First of all, if you leave
 9    this brief colloquy aside, nothing in the case points
10    to racial motive whatsoever.  Even in the
11    Commonwealth's best case, the motive is a sexual
12    advance by the victim.  It has nothing to do with
13    race and there's no other evidence anywhere in the
14    case by the third person, Mr. Hernandez or anyone
15    else, about this.
16              This is in the context of an interview.
17    It's at the very end of the period of time before the
18    defendant jumps up and says I've had enough, I want
19    out of here, and that's when it's cut off, because
20    Judge Hely agreed that that would be the termination
21    of the interview.
22              And what happens here is that he is shown
23    the photograph and it's right at page 53:
24              "Have you ever seen this guy before?  Yes or
25    no.
```

1      "He looks like an N to me." That's repeated

2   and then he says:

3          "Have you ever seen this guy" --

4          "Question:  Have you ever seen this guy

5   right here before?

6          "He looks like an N to me.  No, he's black.

7          "No?  It's a yes or no question.

8          "He's black.

9          "I understand.  Have you ever seen him

10  before?  Yes or no" and then it goes on from there.

11         So my sense of this is that all it is is,

12  for purposes of bias and prejudice there's no value

13  to this other than to show that the defendant has

14  that general bias, not a bias against the victim

15  whatsoever because there is no other evidence of bias

16  against the victim.

17         THE COURT:  Unfortunately, Mr. Feinberg, I

18  have to respectfully disagree.  I think it goes to

19  the motive.  Your client is I think going to allege

20  that he was the victim of a homosexual advance by a

21  man that he calls a nigger.  That adds to his motive,

22  allegedly, for killing him.  It's not only a gay man,

23  possibly a transvestite -- I don't know what he was

24  wearing that night -- but also an African-American

25  man.  All three biases come to play in this alleged

1-28

```
 1    incident.  So I think the Commonwealth is entitled to

 2    elicit the fact that Mr. Cruzado could have been

 3    enraged, not just because he was allegedly touched by

 4    this gay man, but he was allegedly touched by an

 5    African-American man.  That goes to motive, and it's

 6    for the jury to decide whether or not to give it any

 7    weight at all.

 8             MR. FEINBERG:  Please note my objection,

 9    Your Honor.

10             THE COURT:  Clearly I will note it.

11             MR. FEINBERG:  And in that case, I would

12    obviously ask that the question be asked at voir dire

13    that Ms. Broadbent has already raised, namely whether

14    or not --

15             THE COURT:  Well, I'm going to add it, but

16    I'm going to add it in terms of the race question:

17    You will hear that the alleged victim was African-

18    American, the defendant is black.  You will also hear

19    that, allegedly, the defendant referred to the

20    alleged victim as a nigger.  Do you have any feelings

21    about race that might affect your ability to be fair

22    and impartial?  So I think it's appropriately added

23    to that question, all right?

24             MS. BROADBENT:  Yes.

25             MR. FEINBERG:  Yes.
```

```
                                    VOLUME:    II
                                    PAGES:     1-208
                                    EXHIBITS:  1-31
                                    I.D.:      A-C
```

### COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS                    SUPERIOR COURT DEPARTMENT
                              OF THE TRIAL COURT
                              DOCKET NO.: SUCR2011-10628

* * * * * * * * * * * * * * * * *
                                *
COMMONWEALTH OF MASSACHUSETTS   *
                                *
vs.                             *
                                *
MARIO CRUZADO                   *
                                *
* * * * * * * * * * * * * * * * *

        TRIAL (BEFORE A JURY)
        BEFORE THE HONORABLE LINDA GILES

APPEARANCES:

For the Commonwealth:
Suffolk County District Attorney's Office
One Bulfinch Place
Boston, Massachusetts  02114-2997
By: Holly Broadbent, Assistant District Attorney

For the Defendant Cruzado:
Feinberg & Kamholtz
One South Market Building, 4th Floor
Faneuil Hall Marketplace
Boston, Massachusetts  02109
By: Matthew Feinberg, Esq.
By: Matthew Kamholtz, Esq.

                        Boston, Massachusetts
                        Room 806
                        December 12, 2012


            CAROLYN SPROUL, COURT REPORTER
                SUFFOLK SUPERIOR COURT
                BOSTON, MASSACHUSETTS
                   617-285-3725

2-76

1    in Chelsea after he had been homeless for several

2    days, taking a shower there, falling asleep and

3    waking up to the black homeowner fondling his

4    testicles.  She'll tell you about that conversation

5    she had with this man by cell phone and how the

6    defendant told her that he put this man in some type

7    of choke hold and left him and left him on the floor.

8    Phone records that you'll see as exhibits, ladies and

9    gentlemen, will corroborate this.  From December 7 of

10   2010 when this conversation occurred.

11        You'll also hear, ladies and gentlemen, that

12   the defendant was interviewed by investigators in

13   this case, at the Chelsea police station on December

14   7 of 2010.  And although in that videotaped

15   statement, ladies and gentlemen, he corroborates many

16   things that Mr. Hernandez will also tell you, that he

17   ran into his old friend Mr. Hernandez that day, that

18   he fixed a car on Broadway, that he used cocaine that

19   day, he will absolutely deny in that interview ever

20   knowing Fred Allen and ever going to his apartment

21   over and over again.  His exact words: "I don't know

22   that nigger."  Those were the words he used.

23        And you'll examine his statement to the

24   police, and you'll know that he was lying, not only

25   because of what he told Hilda Matiaz, but you will

```
                                        VOLUME:    VI
                                        PAGES:     1-115
                                        EXHIBITS:  NONE
                                        I.D.:      H-K
```

### COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS                    SUPERIOR COURT DEPARTMENT
                               OF THE TRIAL COURT
                               DOCKET NO.: SUCR2011-10628

* * * * * * * * * * * * * * * * *
                                 *
COMMONWEALTH OF MASSACHUSETTS    *
                                 *
vs.                              *
                                 *
MARIO CRUZADO                    *
                                 *
* * * * * * * * * * * * * * * * *

              TRIAL (BEFORE A JURY)
          BEFORE THE HONORABLE LINDA GILES

APPEARANCES:

For the Commonwealth:
Suffolk County District Attorney's Office
One Bulfinch Place
Boston, Massachusetts  02114-2997
By:  Holly Broadbent, Assistant District Attorney

For the Defendant Cruzado:
Feinberg & Kamholtz
One South Market Building, 4th Floor
Faneuil Hall Marketplace
Boston, Massachusetts  02109
By:  Matthew Feinberg, Esq.
By:  Matthew Kamholtz, Esq.

                        Boston, Massachusetts
                        Room 806
                        December 18, 2012


              CAROLYN SPROUL, COURT REPORTER
                SUFFOLK SUPERIOR COURT
                BOSTON, MASSACHUSETTS
                    617-285-3725

6-60

1    he's reaching out to Hilda Matiaz.  He's actually

2    having have conversations with her.  And then right

3    about 7:05 p.m. that night, on November 24, 2010, the

4    defendant -- I mean, excuse me, Fred Allen calls

5    somebody in Montréal.  You know he's from Canada.  He

6    used to live there.  That conversation lasts 12

7    minutes.  Then he calls the last call he ever makes

8    from that phone and that shows you that this is the

9    last time he was alive, was that night, November 24,

10    2010, because the phone was never used again.

11           He calls his ex-husband and speaks with him

12    for 9 minutes and 25 seconds.  What do you think that

13    the defendant was doing for those 20 minutes while

14    the victim was on the phone that night, staring at

15    him listening to his conversation?  No.  The

16    defendant was doing exactly what he told Hilda Matiaz

17    he did on December 7, 2010.  He was using his shower.

18    He was falling asleep in his boxers and all was well

19    and good but the second this Fred Allen, this nigger

20    and a faggot, decided to make a sexual advance on him

21    and grab his testicles, well the fun was over because

22    that is when, ladies and gentlemen, the defendant

23    attacked Fred Allen.  He put him in a headlock; he

24    used a vase to bash him on the side of the head.

25           And you can reasonably infer from the

6-61

1    evidence, ladies and gentlemen, that when he realized

2    how grievously he had injured Fred Allen, he found a

3    belt and finished the job.  He killed the one witness

4    who could have told the police what had happened,

5    that he'd been attacked, because he didn't want to go

6    back to jail.  That's the evidence in this case,

7    ladies and gentlemen, that's what he told Hilda

8    Matiaz and that's what the phone records show.

9    That's what makes sense.

10        There's no boogeyman in this story. ladies

11   and gentlemen.  There are three men:  Fred Allen,

12   Jimmy Hernandez, and the defendant.

13        And you know now that the same reasons why

14   Trooper Canning thought that Jimmy Hernandez could

15   have been the killer are the same reasons that make

16   him not.  He had no reason to harm Fred Allen.  He

17   had no reason to kill him.  Fred Allen was the

18   closest that Jimmy Hernandez was ever going to get to

19   a sugar daddy.  He put a roof over his head; he paid

20   for his food; he bought him liquor.  Mr. Hernandez

21   could treat his apartment like a convenience store.

22        Remember he used that analogy for buying

23   crack cocaine in Bellingham Square?  He could walk in

24   and take a TV, Mr. Allen would take him back.  Walk

25   in and take his cell phone and sell it for drugs,

6-62

1    he'd get taken back.  Push him, have the police

2    called, no charges filed, Fred would take him back.

3             He didn't do this.  The defendant did.  You

4    know it from the phone records, you know it from his

5    own words, you know it from his statements to the

6    police.

7             You'll be instructed, ladies and gentlemen,

8    on not only murder but manslaughter by the Court in a

9    few moments.  The manslaughter theory being heat of

10   passion and sudden combat.  There was no fight.

11   There was no attack back by Mr. Allen.  He didn't

12   have any injuries on his hands, no skin under his

13   nails.  The DNA under his nails was just his own, his

14   profile.  As soon as he touched the defendant, the

15   defendant reacted in a way that he did.  Find him

16   guilty of nothing less than first-degree murder.

17            THE COURT:  Thank you, Ms. Broadbent.

18                       JURY INSTRUCTIONS

19            THE COURT:  Members of the jury, you are

20   about to begin your final duty, which is to decide

21   the fact issues in this case.  Before you do that, I

22   will instruct you on the law.

23            Now, it was obvious to me thorughout the

24   trial that you faithfully discharged your duty to

25   listen carefully to all of the evidence and to